Argued June 8, affirmed June 22, rehearing denied September 28, 1920.

## STATE *v.* ZULLIG.

(190 Pac. 580.)

**Homicide—Evidence—Declarations—Admissibility.**

1. In a prosecution for uxoricide, where the state relied on circumstantial evidence, it appearing that the woman was killed with defendant's own gun and that he was the only adult known to be in the vicinity, evidence that defendant stated he did not question his two boys, both of whom were less than five years old, because they could not or would not answer, etc., together with evidence as to the intelligence of the children, was admissible under Section 727, L. O. L., providing that evidence may be given of the declarations, acts or omissions of the parties, for if, as claimed by defendant, his wife was killed while he was away driving in cows, it would seem most natural that he would question his children, and not make false statements as to their intelligence.

**Criminal Law—Statements by Accused—Inability of Children to Give Information not Res Gestae.**

2. The doctrine of *res gestae* applies where declarations of third parties are offered in evidence, or where the declarations of a party in his own favor are offered, so statements by defendant, who was accused of uxoricide, that he did not attempt to inquire as to the crime from his young children, because they could not or would not talk, are not admissible as part of the *res gestae*.

**Criminal Law—Evidence—Exceptions—Necessity for—Review.**

3. The act of the district attorney in inquiring as to the story of defendant's children of the killing of their mother, whom defendant stated he had not questioned, etc., *held* not preserved for review; there being no exception, and the matter not being made a ground for motion for new trial.

**Criminal Law—Homicide—Evidence—Accused Authorized Taking of His Children Out of Jurisdiction—Admissible.**

4. In a prosecution for uxoricide, evidence that before the trial defendant by written order authorized the taking of his children,

who had been present at the offense, out of the jurisdiction, is admissible, although defendant might well have been actuated by proper motives.

**Homicide—Uxoricide—Evidence—Question for Jury.**

5. In a prosecution for uxoricide, where defendant was the only adult in the vicinity, and his wife was killed with his own gun, circumstantial evidence *held* sufficient to carry the case to the jury.

**Criminal Law—Circumstantial Evidence—Weight—Question for Jury.**

6. The question of the weight of circumstantial evidence is peculiarly for the jury.

**Homicide—Jury—Doubt as to Grade of Offense—Manslaughter.**

7. Under Section 1528, L. O. L., where the jury in a prosecution for uxoricide are in doubt as to the grade of the offense, they should find defendant guilty of manslaughter.

**Criminal Law—Presumption—Jury will be Fair and Impartial.**

8. The presumption on appeal, the jury being in part selected by defendant, is that the jury will be entirely fair and impartial.

From Lake: L. F. CONN, Judge.

In Banc.

Robert Zullig, the defendant, was indicted by the grand jury of Lake County, Oregon, for murder in the second degree. He was charged by the indictment with the shooting of his wife, Emma Zullig, in the northern part of Lake County on October 11, 1918.

The defendant and his wife lived in an isolated part of the county, where the settlement was sparse, and there were no neighbors closer than several miles away.

The fact that deceased came to her death from two gunshot wounds fully appears from the direct evidence of those who saw the body and examined the wounds the ensuing day, but the evidence connecting the defendant with the killing is entirely circumstantial, and consists largely of his own statements and conduct in relation to the death of his wife. On the evening of the 11th of October, 1918, the defendant appeared about 9 o'clock in the evening at the house

of a neighbor, living seven or eight miles from his home, and reported that his wife was dead, that she had been shot, and that he thought it was an accident. He further stated that after supper that evening he went away to a pasture, about a mile and a quarter distant from his house, to drive in his cows, and that when he got back to the gate near the house he met his little boy carrying their gun; that, seeing the gun, he thought something had happened, and immediately went to the house, and found his wife lying dead in the front yard.

The next day at the coroner's inquest it developed that Mrs. Zullig had been shot twice—one ball having entered the right breast, and ranged backward and a little up and was found just under the skin over the middle of her left shoulder blade. The other ball had passed through the left arm, broken it about the middle of the arm, and entered the left side, and, being deflected by a rib, apparently, had turned downward, also lodging just beneath the skin near the spine, and about a half an inch below the twelfth rib. The evidence tended to show that these bullets had been fired from a Marlin rifle belonging to the defendant, and which usually hung on two nails in an alcove in the sitting-room in the back central portion of the house. The two children of the defendant and the deceased, who were living with them on the place, were boys—one about two and the other a little over four years old. According to the evidence, the defendant told several people, about the time and shortly after the killing, that he made no effort to get the children, and especially the oldest boy, to tell what had happened, because they could not or would not talk—that they could not speak in sentences, so he could get any information

from them. The evidence of other witnesses tended to show that these children were more than ordinarily intelligent, and that the oldest one, especially, was fully able to talk and tell a story, and give his impressions in a childish way.

After the arrest of the defendant the children were placed in the custody of a neighbor, who kept them to within a week or ten days before the trial, when they were taken away by a Mr. Staheli, a brother-in-law of the defendant, and a brother of the deceased, upon a written order of the defendant, and he is supposed to have taken the children to somewhere in the east.                                    AFFIRMED.

For appellant there was a brief over the names of *Mr. Gus C. Moser* and *Mr. Roy K. Terry,* with an oral argument by *Mr. Moser.*

For the State there was a brief over the names of *Mr. George M. Brown,* Attorney General, and *Mr. T. S. McKinney,* District Attorney.

BENNETT, J.—The errors relied upon, upon this appeal, refer principally to the admission of evidence on behalf of the state, as to the intelligence and capacity of these children, and their ability to talk and give a statement of the occurrence, and the statements of the defendant as to his reason for not questioning them, and that they were unable to talk, and the denying of defendant's motion for a directed verdict and to set aside the judgment for lack of evidence.

1. We think there was no error of the court in admitting the evidence as to the intelligence and capacity of the children. As there were no eye-witnesses to this tragedy, except the defendant

himself and these two children, and the state was compelled to depend entirely upon circumstantial evidence to connect the defendant with the death of his wife, his every word and act in relation to the transaction, in so far as it might tend to show guilt upon his part, was exceedingly important. If his actions in relation to the occurrence were extraordinary or unusual in any regard, or if his explanation of any of his actions was unreasonable and improbable, it became a circumstance to be weighed against him, together with the other circumstances, by the jury.

It was a reasonable contention on the part of the prosecution, which might weigh more or less strongly with the jury, that an innocent man, coming home after a short absence, and finding his wife shot to death in the yard, and the children of that age immediately about, would immediately have commenced to solicitously inquire from them as to the way in which the tragedy had occurred, and to address himself as best he could to obtain from their childish intellect and childish minds some clue to the cause and manner of the homicide.

If he did not do so—if he did not make any inquiry from them whatever, or seek in any way to obtain any information—the jury might consider it unusual and unnatural conduct, which would weigh very heavily against the truth of his story. If, in addition to this, he gave false statements as to the capacity and intelligence of the children, and offered this as an explanation for his unnatural and unusual conduct, it might add strongly to the weight of his actual failure to inquire.

It would seem only natural that an innocent man, if confronted with a situation of this kind, should not only inquire himself of his children in every pos-

sible way, but should assist, and encourage the neighbors to talk with them about it, and make inquiry, so that every possible clue which might indicate the real cause of the homicide, and the person who was the cause of it, might be obtained. Most persons, we may assume under such circumstances, would have been anxious to have the neighbors know that he had nothing to cover up, and that he was ready and willing to throw any light upon the transaction which could possibly be secured. If the defendant did not do this—made no inquiry himself from the children as to how the homicide had occurred, and discouraged others from inquiring of them by disparaging their ability to talk and making it appear less than it was—that was certainly a circumstance to be weighed against him with other circumstances in arriving at a conclusion as to whether his story as to his absence at the time his wife was shot, and his innocence of any participation in the tragedy, was true.

2. It is urged on behalf of the defendant that these declarations of the defendant in relation to the capacity of the children—not being made at the immediate time of the homicide, and not being directly in relation to that occurrence—were not part of the *res gestae*, and a number of authorities, amongst others *State* v. *Smith*, 43 Or. 109 (71 Pac. 973), and *State* v. *McCann*, 43 Or. 155 (72 Pac. 137), are cited to support the contention. These cases would be squarely in point, if the admissibility of this testimony depended upon the doctrine of *res gestae*. But the admissibility of this evidence did not depend upon that doctrine at all. The doctrine of *res gestae* applies where the declarations of *third parties* are offered in evidence, or where the declarations of a

party *in his own favor* are offered. In either of these cases the declaration is only admissible if it was made immediately at the time of the transaction, and was a part of the occurrence.

This evidence was not admissible upon that ground, nor for the purpose of impeaching the defendant as a witness. It was admissible, however, under another elementary principle, that the declarations of a party, either in a criminal or civil action, are admissible *against him* as declarations against interest. This principle is too elementary and too well established to be subject to any question. It was so at common law. In Greenleaf on Evidence (16 ed.), Volume 1, Section 171, it is said:

"The general doctrine is that the declarations of a party to the record, or of one identified in interest with him, are, as against such party, admissible in evidence."

And again in Section 195:

"In general, a party's conduct, so far as it indicates his own belief in the weakness of his cause, may be used against him as an admission, subject, of course, to any explanations he may be able to make removing that significance from his conduct. In particular, 'falsehood is a badge of fraud, and a case which is sought to be supported by means of deception may *prima facie,* until the contrary be shown, be taken to be a bad and dishonest case'; and this applies equally to civil and to criminal cases."

And Section 727, L. O. L., provides, that evidence may be given on the trial of "the declaration, act, or omission of a party as evidence against such party."

In the case of *State* v. *Smith,* 43 Or. 109 (71 Pac. 973), cited by appellant, the declarations of the defendant were offered *by the defendant himself,* in his

own favor, and of course such self-serving declarations were not admissible in evidence in his favor, unless they were a part of the *res gestae.* In *State v. McCann,* 43 Or. 155 (72 Pac. 137), the person whose declarations were offered in evidence was not a party at all, but a witness, and the declarations offered were offered for the purpose of impeachment. These cases do not bear at all upon a case like the present, where the admissibility of the evidence depended upon the fact that it was a declaration of the defendant out of court, against his own interest, and in the nature of an admission, and was offered *against him* and not in his favor.

There was, therefore, no error in this case in admitting the declarations of the defendant that he had made no inquiry of the children as to the circumstances of his wife's killing, and his explanation of the reason why he did not, and of the falsity of that explanation, if it was false. If the four year old boy was an ordinarily—or more than ordinarily—intelligent boy, and was able to tell a story in relation to anything that had occurred, as was testified by the witnesses, and if he was able to tell these comparative strangers a story of how the killing occurred, it would surely be true that the defendant himself, who was their father, could also have talked with him and elicited some story as to the death of their mother, and how it came about, and if he made no such inquiry, and did not attempt to do so, as he told several witnesses, according to their testimony, and gave a false reason for not doing so, these were circumstances which the jury had a right to consider.

3. It is also urged on behalf of the defendant that it was improper for the district attorney to ask the witness in the presence of the jury, as to the story

which the children had given of the transaction, giving to the defendant and his attorney the opportunity to object to the testimony, if he saw fit. There was no exception to the conduct of the district attorney in this regard, and the court immediately ruled the question improper, and there was, of course, no exception to any ruling of the court. Neither was any alleged misconduct of the district attorney in this regard made a ground for a motion for a new trial. Under these conditions, we do not think the propriety or impropriety of this question, under the circumstances, is before the court for decision. ·

Under such conditions the district attorney is sometimes placed in a more or less embarrassing position. Here, having proved the fact necessary to his case, that the child was able to and would talk about what had occurred, and was able to and did talk about the occurrence, and tell a story as to how his mother's death occurred, the jury would naturally expect to hear what that story was, and would, if the state did not offer to prove the same, be likely to conclude that there was something in the statement that would be against the theory of the state, and that the state had therefore prevented the same from being disclosed. The children themselves had been removed from the state and were out of reach of a subpoena. Probably the district attorney made the order of proof to clear his skirts of any apparent suppression of evidence, leaving it to the defendant to object to the testimony, if he desired to have it excluded.

Individually, the writer of this opinion can see no impropriety upon the part of the district attorney in offering to present this proof, and giving the at-

torneys for the defendant an opportunity to admit
or exclude the testimony, as they saw fit. But in
any event it is clear that the question is not before
the court, and there is no error of the court in that
regard which could result in a reversal.

4. Neither do we think there was any error in admitting the written order of the defendant to Mr.
and Mrs. Hinner, directing them to turn the children
over to defendant's brother-in-law, to be taken out of
the state. It is true that the action may have been
entirely innocent on the part of the defendant, and
may have been taken for the best interests of the
children; but coming, as it did, so immediately prior
to the trial, it was a circumstance which might, in
the judgment of the jury, bear upon the other evidence in the case, and, taken together with the fact
that the defendant did not, immediately after the
killing, make any inquiry of the children, as to how
the death of the mother had occurred, and discouraged others to do so by asserting that they could
not talk, the jury might be justified in drawing the
inference that he sent them away to prevent their
evidence, especially that of the older child, from being presented to the jury. While the circumstance
may not have been of great weight, yet it was properly a matter for the jury to consider, and to be presented to them for that purpose.

5. The only other question presented in the case is
as to the sufficiency of the evidence to sustain the
verdict and make it proper for the court to deny the
motion for a directed verdict. We think the evidence was entirely sufficient to make the question
one for the jury. That the woman was killed, and
killed by two gunshot wounds, was beyond question.
So far as the evidence disclosed, the defendant—ac-

cording to his own statement—was the last known adult person who saw her before she was killed, and the first one present after she was killed.

It seems perfectly plain that there were only five possible theories upon which her death could be explained: (1) Suicide; (2) accident; (3) accidental killing by the four year old child; (4) an attack and killing by some outside person during the interval between the time when the defendant claims to have gone for the cows and his return; (5) killing by the defendant, and the resulting untruthfulness of his story in relation thereto. The jury may have eliminated all these theories, except the last, as unreasonable and improbable.

They may very well have considered the suicide theory as unreasonable, and even impossible. In the first place, there was no evidence to show that the deceased was in such a state of health, or in such mental condition, as to be at all likely to commit such an act, and indeed the effect of defendant's own statements was against any such conditions. Then, too, the character of the gun and the character of the wounds and their range might have seemed to the jury to make it impossible that she could herself have fired the two shots in such a way as to make the wounds, and take the range which they did.

The theory of accident might seem to the jury just as impossible. The fact that those two wounds, one of which broke the left arm of the deceased, and the other passed through the heart, and must have been almost immediately fatal, and the fact that the gun was a lever gun, which would have to be reloaded by throwing a cartridge from the magazine to the barrel, before the second shot could be discharged, together with the points where the bullets entered and

the range they took, might well have made it seem to the jury impossible that both these shots were fired by accident, or that one was fired accidentally and the later one intentionally.

The difficulties in sustaining the theory that the deceased reloaded the gun by the lever and fired one of these shots herself after the other one had taken effect, which would have to be done, after her left arm was broken in the one case, or after she was shot through the heart in the other, are obvious. It was just as difficult to explain the occurrence upon the theory that the four year old child fired both of these shots from some childish impulse, and was able to reload the gun between the firing of the two shots.

There were also difficulties, although perhaps not so entirely insuperable, in the way of the theory that the homicide was committed by an outsider, in an attempt to rob or commit some vicious attack. There is no evidence that anyone had been seen in the immediate vicinity on that evening, and the evidence tended to show that search was made and no tracks were found in the soft, sandy soil immediately surrounding the premises. There was no evidence of any struggle, or that the clothes of deceased were torn in any way. The evidence seems to have conclusively estab__shed that the shots in question were fired with the defendant's gun, which usually hung on nails in the middle or back portion of the house. It would have to follow, if the killing was done by an outside person, that he had in some way succeeded in getting possession of defendant's own gun, and then, after killing Mrs. Zullig with it, threw it down partially loaded and made his escape.

Whether any of these theories were reasonable and probable was for the jury. If these theories were

eliminated, it would seem to follow inevitably that the defendant's story in relation to the homicide was not true, and that he himself had committed the crime.

Then there were a number of affirmative circumstances which might bear more or less against the defendant—his delay in going for help after he reached home; his waiting to remove the cartridges from the gun and to wash and clean it; his hesitation and reluctance in announcing the death of his wife, and in explaining what he claimed to know of it when he reached Anderson's that night; his disinclination and refusal to permit any of the neighbors to stay at the house that night, when they got there about midnight; his wiping and cleaning up the blood about the premises before anyone reached there to inspect it; his failure to show any interest in tracing the cause of the death at the coroner's inquest and afterward; his failure to inquire of the boy, or to make any effort to find out anything about it; his claim that the boy could not talk sufficiently to tell a connected story, which the jury may have believed false; the burning up of his wife's clothing which she wore at the time she was killed; the sending the children away immediately before the trial; and many other circumstances were before the jury for its consideration. It is only fair to say that there were also circumstances and features in the conduct of the defendant which seemed in his favor, but all these circumstances for and against were for the jury, and were submitted and no doubt weighed by it.

6. A case of circumstantial evidence is peculiarly one for the jury. It is for them to weigh the probabilities and the different theories presented; to

say whether each theory is reasonable or possible; to weigh the conduct of the defendant as presented by the evidence, and say whether it indicated conscious guilt or was the natural action of an innocent man under such circumstances. It is not for us to say what our conclusion would be, in view of the same evidence, and under the same circumstances; but we think the evidence was entirely sufficient to make the case one for the consideration of the jury.

7. If the jury believed that the defendant did the killing, but they were in doubt, and could not tell whether it was malicious or under sudden provocation, which would reduce it to manslaughter, they were bound to give defendant the benefit of the doubt, and bring in a verdict for the lesser offense: Section 1528, L. O. L.      There was no error, therefore, in refusing to direct, or in refusing to set aside the verdict when rendered, and grant a new trial.

8. The jury was selected partly by the defendant, and must be presumed to have been entirely fair, and the case was submitted to it under instructions of which there is not the slighest complaint.

We think the judgment of the court below must be affirmed.          AFFIRMED.   REHEARING DENIED.