Argued January 9, reversed and remanded May 21, petition for
rehearing denied June 18, 1952

# STATE OF OREGON *v.* HANSEN
## 244 P. 2d 990

*Robert Mix,* special prosecutor, of Corvallis, argued the cause for respondent. With him on the brief was Sidney B. Lewis, Jr., District Attorney for Benton County, of Corvallis.

*Bruce Spaulding,* of Portland, and *Karl T. Huston,* of Corvallis, argued the cause and filed briefs for appellant.

LUSK, J.

The defendant, Margrethe Sofia Gabrielsen Hansen, has appealed from a judgment of conviction of the crime of murder in the first degree and a sentence of life imprisonment imposed in accordance with the recommendation of the jury.

The charging part of the indictment upon which the defendant was tried reads:

"The Said Margrethe Sofia Gabrielsen Hansen on the 10th day of September, 1950, in the County of Benton and State of Oregon, then and there being, did then and there unlawfully and feloniously, purposely and of deliberate and premidated [sic] malice, kill one Sigrud [sic] Hansen by crushing him with a motor vehicle, contrary to the statutes in such cases made and provided, and against the peace and dignity of the State of Oregon."

Sigurd Hansen, the victim of the alleged homicide, was the husband of the defendant.

The court's denial of the defendant's motion for a directed verdict of acquittal is assigned as error, and a full statement of the evidence therefore becomes necessary.

Mrs. Hansen was born on April 30, 1900, in Iceland of an Icelandic mother and Norwegian father. Upon the death of her father, when she was four or five years old, the defendant and her mother moved to Norway, where she met her husband. Eventually they came to this country. For several years they lived in Coos Bay in this state. In 1945 they moved to Corvallis where Hansen worked at his trade of electrical repairman, while she, for a year or so immediately prior to his death, was employed in a cleaning establishment. The couple had three children, all of them girls. The eldest is married to William Tugman, Jr. The other girls are twins: Bjorg Hansen and Mrs. Lulu Hansen Markman. All three have received college educations.

In Corvallis the Hansens lived in the Wilder Apartments, located at the northeast corner of the intersection of Tenth and Jackson streets. They occupied a small apartment, comprising a living room, dinette, kitchen, bathroom, and a dressing room with what is called a "rollaway" bed. As the events leading up to the tragedy occurred in and around the apartment house, and, as Hansen's death apparently occurred in the garage in which their car was kept, it will be well at this point to describe the premises.

The Wilder Apartments building fronts on Jackson street, an east and west street, and extends in a northerly direction to a depth of 100 feet. It is 47 feet in width and three stories high. Apartments on the west

side of the building look out on Tenth street, a north and south street. The Hansens' apartment was on the third floor on the Tenth street side. Those on the east side face a concrete driveway and a row of nine garages numbered 1 to 9, beginning at the south or Jackson street end of the row. Thus the garages face west, opening on the driveway. The driveway is entered from Jackson street. It is 20½ feet wide, and the distance from the east wall of the apartment building to a garage directly opposite is 30 feet. Garage No. 4, in which the Hansens' car was kept, is the middle garage in the row, and garage No. 5, which was used by Hansen as a work shop, adjoins it on the north. Each garage is 10 feet in width by 17½ feet in depth, about large enough comfortably to house an automobile. The door, which consists of three hinged sections, operates on an overhead trolley and is opened by sliding it from right to left, or south to north. Panes of glass are in the upper part of each section, starting five feet or so from the ground. As the door when closed is not fastened at the floor, there is a "give" of four or five inches at the bottom when pressure is exerted upon it from the inside.

The manager of the Wilder Apartments was Mrs. Mary Loveland. She occupied apartment 106 at the northeast corner of the ground floor facing the garages. On Sunday morning, September 10, 1950, a few minutes after 1:25 a. m., the defendant came to Mrs. Loveland's apartment, aroused her, and told her that "something awful" had happened to her husband. The two women went together to garage No. 4. The door was closed and the light in the garage was burning. Upon opening the door Mrs. Loveland discovered the dead body of Hansen on the floor of the garage at the southwest corner back of the car. It is the state's claim

that the defendant caused the car to be propelled backward against Hansen while he lay on the floor in an intoxicated condition, thereby bringing about his death. The defendant says there is no evidence to support the verdict.

The defendant was a witness on her own behalf, and we will first relate her version of the occurrence given on direct examination. On Saturday, September 9, 1950, she and her husband had lunch together at home, and then went back to their respective places of employment. Feeling tired in the afternoon, the defendant quitted work about 4:00 o'clock and went home. After taking some pills which her doctor had prescribed (she was in the menopause and was suffering from overweight and hypertension) she fell asleep on the sofa. Hansen came home about 5:30, bringing with him some groceries, which included strawberries. He had been drinking. He prepared his own supper, while the defendant ate nothing, though, at his suggestion, she took a glass of wine. She was not, however, accustomed to drinking. She gave him a haircut, and, while doing so, he became cross "and started in the same thing that when he was drinking, that the best for him was more or less if he would get out of it." He was in a "rather dark mood." While she was lying on the davenport trying to sleep, she heard him stumble against a small coffee table that stood in the living room, as a result of which the table was broken. She also heard books fall or being thrown from the book shelf, and she said to him, "Oh, Sig, I do wish that you wouldn't drink so heavy, just let us this weekend try to rest and have it easy." Later she saw books scattered over the floor. This was around 7:00 or 7:30 in the evening. Between 7:30 and 8:00 o'clock Mr. and Mrs. William Tugman, their daughter and son-in-law, ar-

rived from Eugene, where they resided. Hansen told the defendant that he had phoned to them and asked them to come. The Tugmans remained about two hours, during which time the defendant and her daughter went to a restaurant and had a cup of coffee. They straightened up the apartment, which looked "kind of disturbed," and engaged in a general conversation. Hansen was quite depressed. The Tugmans left about 10:30, after first arranging to return the next day and go on a picnic. Mr. and Mrs. Hansen accompanied them to the street. The defendant went with them to their car, while Hansen went to his car, which he had parked on the street in front of the apartment house, and drove it to the garage. The defendant thought that she did not go to the garage before returning to the apartment, though she testified that she might have done so for the purpose of inducing Hansen to return to the apartment with her. Upon reaching the apartment she went to the bathroom and spent some time there, as her stomach had been out of order for two or three days. She thought once that she heard Hansen in the apartment, but, on going to the living room, found no one there. She then lay down on the sofa and went to sleep. Upon waking she felt the need of going to the bathroom, but, before she could reach the bathroom, had an involuntary movement of the bowels in the kitchen. After this she looked at the clock. It was 12:20 or 12:30. Her husband had not returned, and she went to the garage in search of him. On a number of previous occasions when he had drunk too much she had found him asleep in the garage or the work shop. The work shop was dark. She opened the door of garage No. 4, turned on the light (which was overhead at about the center of the garage), and, upon entering, found her husband lying on the floor to the

left of the car, his head toward her and his feet toward the back of the garage. The front door of the car was open, and she thought that he had either fallen out of the car or had fallen asleep there. She spoke to him and asked him to come up; he did not speak "any clear words," but she thought at the time that she heard him groan. After pleading with him several times to come up with her she took hold of him under the arms and managed to drag him along the floor in back of the car and to the right-hand corner of the garage. (It should be noted here that Hansen was five feet eight inches tall and weighed 145 pounds.)

When she had moved him to the narrow space between the back of the car and the closed door of the garage she discovered, by the aid of light coming from the outside through the windows in the garage door, that his face was bloody. She then went to their apartment, obtained a wet wash cloth, returned, and started to wipe her husband's face, and, while so engaged, discovered that he had a sore or cut on his forehead, that his mouth was twisted, and the blood was starting to dry. He had a set of upper false teeth which were dropping down, and, when she tried to straighten them, she noticed something wrong with his tongue, and took his hand and found that it was cold, and concluded that "something must have happened" to her husband and that she should summon a doctor. Thereupon she hurried over to Mrs. Loveland's apartment and gave the alarm.

Mrs. Loveland called the police, a procedure to which the defendant appears to have strenuously objected.

There is ample evidence that Hansen was crushed to death as the result of his own automobile backing into him.

Dr. Howard R. Richardson, director of the Oregon State Police Crime Laboratory, performed the autopsy. He tested the victim's blood for alcohol and found that it contained 0.27 grams of alcohol per 100 cc's of blood, and gave it as his opinion that the man was drunk at the time of his death. The degree of drunkenness would depend upon the individual's tolerance to alcohol; the quantity was sufficient to render one man unconscious, while another might have been able to walk about.

The witness testified that on the left side of the victim's chest the fifth, sixth, seventh and eighth ribs, and on the right side the third, fourth, fifth, sixth and eighth ribs, had been fractured. Before opening up the body, he testified, "this entire part of the chest could simply be pushed in with the hand." The abdominal cavity was opened, but no evidence of injury was found below the eighth rib on the right side and the eighth rib on the left side. The set of wounds across the chest "produced a sudden crushing injury producing death immediately or within a few seconds." The direction of motion of the force which produced the injury was upward, causing the lungs to blow up inside the body "like a balloon." Further evidence that the pressure was upward was the absence of blood in the abdominal cavity below the area of the chest where the pressure was applied. The pressure could have caused the breaking of the ear drums, and small blood vessels could have popped and squirted out blood. Blood was found inside the ear canal on the right side. There was no evidence, Dr. Richardson testified, of fracture in the back. At the time of the crushing the man was alive.

There was no evidence of fracture of the bones of the face or of the skull or of the bones at the base of the skull, though there was bleeding inside the ears.

In addition to the injury to the chest, however, there was another set of wounds which could have been received after death. These were abrasions or scratch markings, skin deep, about the left side of the nose and mouth. Microscopic examinations and experiments made by the witness indicated, and would have justified the jury in finding, that these marks were caused by the victim's face coming into contact with the exhaust pipe of the Hansen automobile. Carbon material similar to that which was found on the exhaust pipe was detected on Hansen's shirt. Material found on the exhaust pipe included threads similar in color and texture to the blue fabric in the shirt worn by the victim. There was reddish material in the threads which, microscopically examined, had the appearance of being blood, and, likewise, material having the appearance of skin when studied under the slide.

As shown by the uncontradicted testimony, the distance from the floor of the garage to the bottom of the rear bumper was thirteen and one-half inches and to the bottom of the bumper guard on the right side eleven and three-fourths inches; the width of the bumper was five inches; and the bumper guards extended out beyond the bumper proper and to the rear two to two and one-half inches.

Asked what force or blow caused the injuries, Dr. Richardson testified:

"Some tremendous force that went across the lower part of the chest involving the ribs on the left side, 5, 6, 7 and 8, and involving the ribs on the right side, 3rd, 4th, 5th, 6th and 8th, and having such a forceful nature that it caused almost immediate or sudden death in such a force that would impinge or cause the body to be in a vice, you might say, either the back had to be impinged against a fixed object and pressure brought against the front of the body

to produce this result, this tremendous crushing result."

Dr. Richardson expressed the opinion that the most logical way of explaining the injury was that it was caused by the automobile moving backward with a pressure of from 500 to 600 pounds and the bumper coming in contact with the body of the deceased. This opinion assumed that the body was in a semi-vertical position and was not in the corner of the garage where it was found by Mrs. Loveland and the police, but some two feet over to the left or north, and that the garage door was closed at the time. The witness testified that only a mechanical force could have applied this pressure so evenly and equally, and that this force was from the front of the body toward the back. He explained later that he could not determine the position of the entire body, but that the injuries indicated that the chest was in an upright position.

There was blood on the rear bumper of the car, especially along the side of the right bumper guard and on the right side of the bumper proper. There was some blood across the center of the bumper and some on the left side. There was blood also on the inside of the door near the lower left-hand corner (as one inside the garage faces the door). The spots looked as though they had been made from the bottom up, that is, as a witness described them, "they struck out to a thin line at the top from about 8 inches from the floor." Close to the floor where there was blood on the door, it looked as though someone had tried to wipe the blood away.

There was no blood on the floor of the garage to the left of the car. To the left rear of the car there was a partial heel print in a colored substance that one of the officers took to be blood. There was blood

on the left rear door handle of the automobile. It looked as though a bloody hand had taken hold of the handle. There was a small streak of blood on the chrome metal of the left rear wind-wing of the car, which is located behind the left rear door, and a spot of colored material, that a witness took to be blood, the width of an ordinary match stem and approximately one-half inch in length on a 1 x 2 cleat which was nailed on the north wall of the garage at a point where the door would stop when it was slid back to open it.

Immediately to the left of the door jamb, at the southwest corner of the garage, there was a pool of blood, and outside the garage there were blood stains going from that corner toward the front of the apartment building. They were ''in a pattern as if they had been tracked.'' There was a blood stain in front of the garage about two inches in diameter.

When Hansen's body was discovered the front bumper of the car (a 1948 Plymouth sedan) was against the back wall of the garage. The distance from the rear bumper to the door was approximately 13 inches. From the right side of the car to the south wall of the garage the distance was approximately 10 inches, and the distance from the left side of the car to the north wall was a little over three feet. The car's gear shift was of the standard type, operated manually. The starter button was on the instrument panel to the left of the steering column. There was a two-way switch. When the key was inserted and turned to the right it energized all the electrical parts, the ignition, the horn, the starter and heater; when turned to the left it energized everything except the ignition, and the car would not start. The starter would operate only when the switch was turned on.

No keys were in the ignition switch when the car was examined immediately after arrival of the police. The car was then in either second or reverse gear, according to the testimony of one of the officers. A set of car keys, which Hansen customarily carried, was found in his pocket. There was an extra set of keys to which further reference will be made later in this opinion. The automobile was examined for finger prints by ·Clark Johnson, assistant to the director of the Oregon State Identification Bureau, who had had specialized training in the field of finger prints and identification, but the only finger print developed that could be identified was one of the left thumb of the victim found on the inside of the wind-wing in the right front door. The only other effort to develop finger prints on the automobile was made by the witness, Milo Askay, deputy sheriff of Benton County, who testified that the dust had been disturbed over practically the entire body of the car, that it gave the appearance of a hand sliding on the car, and that some of these marks were examined for finger prints. None were found.

The officers found three wash cloths on the premises. One was on the parking strip in front of the Wilder Apartments, on the Jackson street side, at a point which would be passed by anyone walking from the main entrance of the apartment house to the garage. It was damp and there was blood upon it. Another was found under the work bench in garage No. 5, Hansen's work shop. There was vomit on it, but no blood. There was also vomit containing berry seeds on newspapers found in a barrel in the work shop. The defendant made statements in which she said that she had eaten strawberries the previous evening and

that she thought that her husband had not. A damp wash cloth was also found on the kitchen sink.

In the work shop there was found a large wine jug something less than half full of wine.

The time of Hansen's death was estimated by Dr. Paul N. Scott, coroner of Benton County, as 12:30 a.m. He arrived at the scene about 2:15 a.m., and, after an examination of the corpse, concluded that Hansen had been dead an hour and a half to two hours, "and arbitrarily assigned the time to 12:30." Dr. Verne S. Gearey, who was called by the police and who arrived at the garage about 2:05 a.m., testified that there was no heat in the body at that time. He thought that death occurred one or two hours before he arrived.

We will return now to the events of Saturday evening.

At about 7:00 or 7:30 p. m. Mr. and Mrs. Hansen were seen by three witnesses in the vicinity of Ninth and Jackson streets. Hansen was walking ahead of his wife, his head down, and she was following at a faster pace. She caught up with him, "grabbed a hold of his right arm and spun him around, and they stood there talking." One of these witnesses watched them while they walked to the front of the apartment house. This witness testified that "they were both staggering" and that as they came in front of the entrance to the apartment house Mrs. Hansen "fell to her knees and down on the ground as though she dropped something, and he just stood there."

Mr. and Mrs. Floyd Rudie occupied apartment 102, located on the ground floor at the southeast corner of the Wilder Apartments. Shortly after 7:00 p.m. Mr. Rudie's attention was attracted by loud voices outside of their apartment, which faces Jackson street.

He looked out and saw Hansen standing with his back to the window talking to someone, and, going to the window, saw Mrs. Hansen down on the sidewalk. She appeared to be under the influence of alcohol. Mrs. Hansen got up and looked at him, "and she had a kind of a glassy stare in her eyes." She "looked as though she was a little peeved at Mr. Hansen." Asked to describe it in terms of emotion, the witness said: "If you were mad at someone, really perturbed about something that come up and you'd display anger towards them." Mrs. Rudie, who likewise witnessed the incident, testified that Mrs. Hansen looked "like she was very angry, mad," but that neither of the Hansens appeared to be intoxicated. Hansen talked a little while before his wife got up from the ground and then they went up to their apartment. Mrs. Rudie heard the defendant fall again as she reached the head of the landing.

The defendant's physician was Dr. Waldo W. Ball. He had been treating her for high blood pressure, hypertension and obesity. In August, 1950, she had weighed 188 pounds, but by September 9 her weight had been reduced to 178 pounds. Dr. Ball prescribed tablets called theobarb for her hypertension and thyroid extract for her obesity. According to his testimony, on the evening of September 9, while he was at dinner, Hansen phoned and asked him to come and see Mrs. Hansen. On questioning Hansen he learned that Mrs. Hansen's condition was not serious. Dr. Ball demurred, saying that he had an appointment with her for the following Monday, but Hansen said that he did not like to wait until Monday, and the doctor agreed to come after he had finished his dinner. At about 6:30, however, after he had finished his dinner and was on his way to get his car to keep the

appointment with Mrs. Hansen, Hansen phoned the physician again and told him that Mrs. Hansen was lying on the daveno relaxed and that he need not come.

It was at about this time that Hansen phoned Mr. and Mrs. Tugman at their home in Eugene and asked them to come to Corvallis. They set out immediately, as Hansen said that Mrs. Hansen was not well and Mrs. Tugman was worried about her mother's health and feared that she might have a heart attack. Mr. Tugman was a witness for the state and Mrs. Tugman for the defense. Their testimony disclosed that on arriving at the Wilder Apartments about 7:30 they pushed the buzzer at the entrance which connected with the Hansen apartment, but received no answer. They then looked up at the apartment from the street, and, seeing a light, concluded that someone was home and rang the apartment of Mrs. Loveland, the manager, who let them in. They walked up to the third floor, knocked on the door of the Hansen apartment, but, receiving no answer, entered and found the apartment in a condition of disorder, the coffee table broken, books on the floor, and vomit on the floor of the kitchen. Hansen was seated in a chair and Mrs. Hansen was half reclining on the davenport. Mrs. Hansen evidently did not know that they had been sent for because she asked them why they had come. They inquired about the condition of disorder in the apartment, but were given no explanation. Mrs. Hansen's face was flushed and she appeared to be very weak. They undertook to clean up the apartment, and Mrs. Hansen helped, though her husband did not. Once during the progress of this work Mrs. Hansen fell to the floor. It did not occur to Mr. Tugman that alcohol had anything to do with the situation and he did not smell

liquor. Mrs. Tugman's testimony, however, indicates that she thought that her father had been drinking heavily, and she attributed his moroseness to this fact. The Tugmans were there until about half past ten, except for the few minutes when Mrs. Hansen and Mrs. Tugman went out to a restaurant. During the evening Hansen was extremely moody. He complained that nobody loved him, said that he was not worth anything, had crying fits, and talked of suicide. At one time Mrs. Hansen moved over to Hansen's chair and attempted to smooth his hair, but he showed annoyance, and when she turned on the light near the chair he would turn it off. Hansen's mental state seemed to improve somewhat after Mr. Tugman endeavored to cheer him up while Mrs. Hansen and her daughter were absent. Shortly before the Tugmans left the defendant suggested a cribbage game, and took a cribbage board from a shelf and placed it on the table in the dinette. The Tugmans, however, pleaded that they wished to return to Eugene and left about 10:30, Mr. and Mrs. Hansen accompanying them to the street. It was at this time that Hansen got his car to put it in the garage. The Tugmans left with the understanding that they would return the next day and go out with Mr. and Mrs. Hansen to look at a piece of property on which the Hansens were thinking of building a home, and for a picnic.

When the officers arrived at the Wilder Apartments early on the morning of Sunday, September 10, and examined the Hansen apartment, they found on the table in the dinette, in addition to the cribbage board which has just been mentioned, a red key case containing automobile keys partly exposed. This was the extra set of keys to the Hansen car. A photograph of the table taken at that time, showing the cribbage

board and the keys and one or two other objects, is an exhibit in the case. Both Mr. and Mrs. Tugman were asked if they had seen the keys while they were there and testified that they had not.

We have heretofore summarized the testimony of Mr. and Mrs. Floyd Rudie concerning the actions of Mr. and Mrs. Hansen about 7:00 o'clock on Saturday evening. They were also witnesses to some of the events that occurred later in the night. They went out for the evening and returned about 11:00 o'clock. It will be recalled that their apartment was on the ground floor at the southeast corner of the Wilder Apartments. The windows of their bedroom and bathroom looked out on the concrete driveway and the garages, garage No. 4 being approximately 50 feet distant. At about 12:15 a.m. Mr. Rudie, who had not yet gone to bed, "heard the garage doors rumbling back and forth," and, looking out, saw through the windows in the door of garage No. 4 Mrs. Hansen leaning against the north wall of the garage. She looked exhausted as though she was resting from some exertion. She was about opposite the front seat on the left side of the car. Mr. and Mrs. Rudie went to bed and "those garage doors kept rumbling spasmodically now and then." At about 1:20 a.m., as the witness finally fixed the time, he and his wife got up, looked out, and saw Mrs. Loveland standing in front of garage No. 4, apparently looking through the garage window. Mrs. Loveland turned around and went back into the apartment house. Mr. Rudie was again aroused by the noise of the garage door at 20 minutes to 2:00, and saw Mrs. Loveland and the defendant standing in front of the garage with the door partly opened. Mr. and Mrs. Rudie went out to the garage, turned the light on, and saw Hansen's body. The defendant protested when calling the police

was suggested, and said it was not a case for the police. Mrs. Rudie took the defendant to their apartment, and Rudie went with Mrs. Loveland to the latter's apartment and called the police. Rudie testified that he and his wife heard the garage door closed probably four or five times, and heard someone go from the garage through the front door of the apartment and upstairs several different times between midnight and the time they called the police.

Mrs. Rudie's testimony corroborated that of her husband, with some additional details. She said that she did not go to sleep all night, and that Mrs. Hansen made four or five trips from her apartment to the garage. The second time that she saw Mrs. Hansen, which was about 15 or 20 minutes past 12:00, the garage door was open and the defendant was just inside the door, stooped down cleaning something up. The defendant presently closed the garage door, turned out the light, and hurried to the apartment house and up the stairs. The witness testified:

"Q Did you see or hear Mrs. Hansen at any later time?

"A Yes. After she left the garage and turned around, I went back in the bedroom and I heard the garage door, I heard someone come down again and I heard the garage doors opening and banging, so about 5 minutes or so, I would say, I got up and went back in the bathroom and I looked out again.

"Q And what did you see?

"A I saw Mrs. Hansen again.

"Q And what was she doing?

"A She was still cleaning something from the ground or from the driveway.

"Q And what part of the driveway?

"A Just outside the doorway.

"Q Of garage No. 4?

"A Yes."

The witness explained that the first time she saw the defendant cleaning up something on the concrete she was doing so on the inside of the garage; the next time it was outside the garage close to the door. Every time the defendant left the garage she closed the door and turned off the light. In the Rudies' apartment the defendant said to Mrs. Rudie, "I just don't care what happened. I just don't care what happened." Again she said, "I'll go to Norway. My people are wealthy in Norway. They have a big estate in Norway." Mrs. Rudie testified that the defendant had blood spots down the front of her dress and under one arm and a great deal of blood on her hose and on her shoes. The defendant objected to the police being there. She told Mrs. Rudie that she had gone down to the car with the children (meaning the Tugmans), and that her husband had put the car away and did not come back; that she washed a few dishes and went to the garage to find him, and found him sitting in the car, and, upon being asked if Hansen said anything when she found him, she said "first he mumbled something." She explained the presence of blood on her clothing by saying that she thought that Hansen had a nose bleed and she took a wash cloth to wipe the blood from his face.

Edna Goheen, who occupied an apartment on the second floor of the Wilder Apartments, had occasion to be in the driveway about opposite garage No. 2 between 20 and 25 minutes to 11:00, and at that time heard the voices of Mr. and Mrs. Hansen coming from garage No. 4. The light was on and a car was in the garage. It was "quite loud talking and quite rapid talking."

John David O'Dea, who occupied apartment 306 at the northeast corner of the apartment house on the third floor, testified that between 11:10 and 11:15, looking out of the window, he saw Hansen in his lighted

work shop standing at the end of his work bench. Later, after O'Dea had retired, he knew that the light in the work shop had been turned off because it no longer shone into his bedroom.

Mrs. Loveland testified that she saw Mrs. Hansen about garage No. 4 a couple of times early Sunday morning, though she could not fix the time. She had gone to bed and the light from the garage was shining in her windows, but, as she saw Mrs. Hansen out there and knew she always shut the light off when she got through, she gave the matter no attention. Later she woke and noticed by the clock that it was 1:25 and that a light from one of the garages was still shining. She got up to turn it off, thinking it was in the garage next to the Hansens, but when she came to the door of No. 4 she saw Mrs. Hansen inside, and immediately went back to her apartment. Through the window of the garage door she observed the defendant at the front of the garage on the right-hand side "kind of stooping over like she was picking something up off the floor." The witness told about the defendant coming to her apartment very shortly after she got to bed again, and about her going back to the garage with Mrs. Hansen, her discovery of Hansen's body, and the defendant's objections when she suggested calling the police.

Kenneth Burright, a city police officer of Corvallis, was with the defendant in the Rudies' apartment early Sunday morning and made notes of her statements, some of which are found in the following excerpts from Burright's testimony:

"A Mrs. Hansen, the way she — Mr. Hansen went down with the Tugmans to see them off. She stayed in the apartment. The way I got it, she laid down on the daveno and waited for him. He didn't return. After an hour or so, she was alarmed and

went down to see what was the matter. She said she found Mr. Hansen lying on the left side of the car. She said that she moved Mr. Hansen, she didn't say where, and returned to the apartment to get a rag to wash him. She returned and washed his forehead. At the time she found him on the floor she said she said to him, 'Come, Sig,' and he mumbled something to her. She said she didn't know what he had said. She then went back to the apartment thinking that he would return in a little while. When he didn't, she went back again and his hand to the feel was cold. She was alarmed and went for Mrs. Loveland.

"Q You recall anything else that Mrs. Hansen said at that time?

"A Mrs. Hansen said when I first saw her, kept repeating she didn't want it to be a police case. She also said he must have had a heart attack or had fallen to hurt himself that way.

"Q Do your notes show anything else that she said, Mr. Burright?

"A There is a notation here that said she said he has no enemies and also he never carries much money on him.

"Q Do your notes show anything else that she said?

"A A notation here, says she says he drank before and stayed in the garage to all hours.

"Q If you will just continue through your notes, anything that she said.

"A Notation here that says she says he has been very despondent lately. Notation here concerning relatives and where they live."

Concerning the defendant's appearance and actions during this time Burright testified:

"Mrs. Hansen appeared to me to be bewildered and she didn't want me around her, didn't appear to, and every time I'd look at her she's be following me with her eyes. Later in the morning, when we moved to an apartment upstairs, she showed emo-

tions, such as hysterical laughing. It might be classified as crying, but I at no time witnessed any tears and I watched her quite closely."

Dr. Scott, the county coroner, talked with the defendant in the Rudies' apartment. He testified:

"A I asked Mrs. Hansen if Mr. Hansen had been ill. She replied that, no, he hadn't been ill. I asked her if he had been unhappy, depressed, and for quite a time she went on it then that he had been quite depressed. Then I asked her, rather pointedly—

\* \* \*

"A I said, 'Mrs. Hansen, do you think that your husband killed himself?' She said, 'No.'' I asked her, 'Mrs. Hansen, had he been quite depressed?' She said at that time, 'No, he had been drinking quite a bit.' I asked her at what time she had or what time he had been up in the apartment, and she said that he left the apartment earlier in the evening. She didn't know just what time it was. I said then, 'Then what happened?' She said, about 11:30 she went down to the garage becoming worried about him, to see what seemed to be the trouble, and when she went to the garage she found Mr. Hansen lying on the floor crawling about and bleeding. I said, 'What did you do then?' She said, 'I returned to the apartment, got some cold cloths, went back to the garage and wiped the blood from him.' I said, 'Was he rather badly wounded?' and she said that he was bleeding rather badly. I said, 'Mrs. Hansen, under those circumstances when he was bleeding, wounded, crawling about on the floor as you state, why didn't you summon help?' She said that he had been drinking and she didn't want the neighbors to know that fact and that's why she didn't summon help. I asked her when she found him again and she said that she went out about 12:00 p. m. to the garage and this time was going to help him some more, but as she touched him she discovered that he was cold and thought that per-

haps something had gone—that he was dead and—I'll stop there.''

Beulah Hickman, a deputy sheriff, who was with the defendant early Sunday morning, described the condition of the defendant's clothing as follows:

"On the dress was, I would say—I couldn't say whether it was one or two fairly good size spots on the front of the dress. There were spots on the underskirt through. There was blood on the right leg and stocking and blood on the shoes. They were a Cuban heel shoe approximately two inch heel. The principal blood on the shoe was under the arch of both shoes. On Mrs. Hansen's underwear there was evidence of a diarrhea. I believe that's all in her clothing.''

Miss Hickman took shorthand notes of a statement made by the defendant to the district attorney on Sunday. Among other things, the defendant said, according to Miss Hickman's testimony, that after the Tugmans arrived, "the evening was spent in conversations such as families indulge in and in a pleasant discussion of things of interest to the family''; that the Tugmans left around 10:30; that she, the defendant, did not go downstairs but bade them goodbye at the top of the stairs, and Mr. Hansen went down to put the car away; that after about an hour she went down to the garage, where she found Hansen on the right-hand side of the car, she thought, the opposite side from the driver's side. The defendant said further, according to Miss Hickman's testimony:

"* * * She spoke to him, and she thought that he attempted to answer or made some noise in his throat, and she tried to get him to his feet to get his feet up under him and dragged him to the rear end of the car. There, she stated, by the light from the street light she noticed the blood upon his chest.

She noticed profuse bleeding from the nose and the mouth, I believe from the ears too, bleeding from the ears.

"She went upstairs to get a wash rag to clean him up, and when she came down and washed the blood off and one hand she noticed beginning to be clammy. She then knew that something was wrong, and at that time went and called Mrs. Loveland and Mrs. Loveland—she said Mrs. Loveland came and suggested there was something wrong and the police should be called. Mrs. Hansen did not know who Mrs. Loveland called."

With minor variations, the remainder of her statement was substantially in harmony with her testimony on direct examination.

■ At the conclusion of the state's case in chief the defendant moved for a "dismissal" on the ground that there was no proof of the corpus delicti and no evidence that the defendant committed the crime charged in the indictment or any of the lesser crimes included therein. The motion was denied. At the conclusion of all the testimony the defendant moved the court for an order withdrawing from the jury the charge of first degree murder "on the ground that there was no evidence" of "the intent and malice necessary to support a charge of first degree murder". Defendant did not formally move for a directed verdict, specifying the grounds of such motion, at the conclusion of all the testimony, as must be done in order to preserve the question on appeal. *State v. Jeannet,* 183 Or 354, 360, 190 P2d 983; *State v. Reynolds,* 164 Or 446, 480, 100 P2d 593; *State v. Adler,* 71 Or 70, 73, 142 P 344. She did, however, with her requested instructions submit a request which would have told the jury that there was no evidence to sustain the charge and that they should return a verdict of not guilty. The denial of

this request is assigned as error, and we shall treat the procedure adopted by the defendant as a sufficient compliance with the rule.

*Sufficiency of the Evidence*

■■ We preface our discussion of this question by repeating what we said in *State v. Dennis,* 177 Or 73, 78, 159 P2d 838, 161 P2d 670, concerning the function of the court when passing upon a motion for a directed verdict of acquittal in a criminal case based on circumstantial evidence:

"The question before this court, however, is not the same as that which was before the jury. We are not directly concerned with the weight of the evidence, nor with the conflicts in the testimony, nor with the credibility of the witnesses. It is our duty to determine if there was sufficient circumstantial evidence of guilt from which the jury, in the performance of its function as triers of the fact, could properly find a verdict of guilty. State v. Rosser, 162 Or. 293, 86 P. (2d) 441, 87 P. (2d) 783, 91 P. (2d) 295. We weigh and examine the evidence only to the extent necessary for the performance of this duty. Defendant's motion for a directed verdict is in the nature of a demurrer to the evidence which admits the truth of the evidence of guilt and all reasonable inferences therefrom. The sufficiency of the evidence, when tested by a motion for directed verdict, will be considered in the light of these principles, but we are not to be understood as assuming the function of the jury."

First, as to the corpus delicti, that is, the fact of death and the criminal agency of another as the cause thereof. We think that this calls for but little discussion. On the argument, counsel for defendant conceded that there was ample evidence that Hansen's death occurred in the garage. This was a concession that could scarcely be avoided. If death occurred in

the garage it could certainly be found that Hansen was crushed by the automobile backing into him. There was blood on the rear bumper of the car, and there was blood on the door of the garage. The medical testimony shows that Hansen, while on the floor of the garage back of the car, his chest in an upright position, was crushed to death by a mechanical force, the direction of motion being upward as demonstrated by the character of the injury. The blood on the door would appear to have spurted upward, being probably forced through the ear of the victim. The upper portion of the bumper was beveled inward toward the car; the lower portion, therefore, would have first come into contact with the body and the pressure would be upward as it continued to be exerted. Even without Dr. Richardson's expert opinion, a layman's logic would point unerringly to the automobile as the agency of destruction. Suicide, under the circumstances, may be ruled out as a physical impossibility. Accidental death, perhaps, was possible, but, weighing that possibility in the light of the entire testimony against the alternative of an intentional and criminal act, the jury had the right to reject it.

■ Motive does not enter into a crime as an essential ingredient; but "defendant's motive is always inquirable into for the purpose of establishing an antecedent probability of his committing the offense." Clark and Marshall, Crimes (3d ed) 76, § 48; and proof of motive is of great importance in cases depending on circumstantial evidence. *State v. Sing,* 114 Or 267, 279, 229 P 921, and cases there cited.

The evidence as to the conduct of the defendant and her husband from the time that he arrived home about 5:30 on the afternoon of September 9 until the Tugmans left at about 10:30, justified the jury in

finding that Mrs. Hansen had a motive for committing the crime with which she is charged. Counsel for the defendant would minimize the differences between the couple, and they argue that the evidence does not disclose an adequate motive. Theirs may be a permissible view, but it is not the only one, and it is not for the court to say which is the correct one. That was a jury question, which was properly submitted to the jury in an instruction to which no exception was taken. An authority on criminal law says, "We are all of us apt to act on very inadequate motives; and the history of crime shows that murders are generally committed from motives comparatively trivial." 1 Wharton's Criminal Law (12th ed), 215, § 158. There are indications of a violent quarrel, brought on perhaps by the defendant's objections to Hansen's drinking, during the course of which he broke a table and threw books about the apartment—a quarrel which was carried out into the public street, where the defendant manifested great anger toward her husband, and arrested the attention of passersby in their automobiles. The defendant did not deny the testimony as to what occurred on the street. She merely said that she had no recollection of those things. Some notion of the state of mind of both the Hansens may be gained from the fact that neither of them took the trouble to clean up the apartment until after the Tugmans arrived. They even allowed the noisome vomit to remain on the kitchen floor. The action of Hansen in cancelling the physician's engagement and phoning the Tugmans to come from Eugene, a city 39 miles distant, could be taken to indicate that it was not Mrs. Hansen's health which most concerned him, but some major disturbance of their relations with which he felt unable to cope alone. He was depressed and morose, a condition no doubt

partly, at least, induced by drink. The failure of either of the Hansens to answer the buzzer when the Tugmans arrived, or even to respond to their knock on the apartment door, is a strange and inexplicable circumstance. But the entire story of that evening, when the various incidents are pieced together, would have justified the jury in concluding that, partly due to liquor, partly to the condition of Mrs. Hansen's health, and, perhaps, indeed, to some temporary mental abnormality, a crisis of grave proportions had come in the lives of these two people which had within itself the seeds of tragedy. It was something far different from what the defendant described as an evening spent "in a pleasant discussion of things of interest to the family."

The evidence, of course, is entirely circumstantial, but the circumstances are such as to warrant submission of the case to a jury. If the defendant's version be accepted she is entitled to acquittal, but her story could be found to be highly unreasonable and improbable. What woman intent on her husband's welfare, it may be asked, coming upon him lying on the garage floor, crushed and bleeding, would have acted as she did? The question which Dr. Scott asked her early that morning, "Mrs. Hansen, under those circumstances when he was bleeding, wounded, crawling about on the floor as you state, why didn't you summon help?", would at once occur to anyone hearing her account of the affair. Her answer, that she didn't want the neighbors to know that he had been drinking, might be deemed inadequate, under the circumstances, especially in view of her actions, on the public street earlier in the evening. If she was trying to assist him out of the garage and back to their apartment, why did she not take the obvious and comparatively easy course

of opening the garage door and bringing him straight out along the left side of the car instead of dragging him, at great expenditure of her strength, through the narrow and confined space of about 13 inches between the car bumper and the door? She had no explanation for this singular conduct except 'that she did not think of it.

Her statement to the district attorney on Sunday was that she found Hansen on the right side of the car. This would be hard to believe, in view of the fact that the distance between the right side of the car and the south wall of the garage was only 10 inches. Afterwards, however, her statements out of court and her testimony are in agreement that she found Hansen on the left side of the car, and they are all to the effect that he was then alive and that he had received the injuries from which he died. In view of the nature of these injuries, a jury might reject her testimony that she did not then see blood upon him and did not discover it until the light coming through the windows of the door revealed the blood after she had dragged him back of the car. Why would not this same light have revealed the same thing when she lifted him up only a few feet away from the door? Why, indeed, would she turn off the light in the garage, as she testified on cross-examination that she did? These are questions which would naturally be asked by those called on to determine whether she was engaged in performing the kindly ministrations of a wife or in some dark and sinister business.

The jury would have been warranted in deciding that the man was not injured until after he was dragged to the rear of the car, and, therefore, that the defendant's story was a fabrication. There was no blood

on the floor of the garage to the left of the car in the area where she said she found him. One would naturally expect to find blood there if he had already been injured. There is no clear explanation of the presence of blood on the cleat on the north wall of the garage or on the handle of the car door, but it could hardly be claimed that either came from the crushed and bleeding body of Hansen on the garage floor. It is established by the evidence that Hansen had cut his finger earlier in the evening and that it bled freely. This may have been the source of the blood on the cleat and the door handle.

The defendant's story, moreover, is wholly inconsistent with the medical testimony, the evidence as to the nature of the victim's injuries, the evidence of blood on the rear bumper of the car and on the inside of the garage door. These things all tend to show that Hansen was killed almost instantly by the car backing into him. If this evidence and the inferences that may be legitimately drawn from it are believed, then it follows that, when the defendant found her husband lying upon the floor of the garage to the left of the car, he had not been injured and that he was killed by the means and in the manner stated after the defendant had placed him behind the car. In connection with her own testimony, this is evidence of a convincing sort that the defendant was in the garage with her husband when he was alive and with him when he died. No one else was there. No one else, the jury could find, was in or about garage No. 4 or the adjoining garage used as Hansen's work shop from 10:30 until 25 minutes after 1:00, when Mrs. Loveland left her apartment for the purpose of turning off the garage light. The decedent had no known enemies and he was not robbed. If all these things are so, the conclu-

sion follows naturally that the defendant brought about her husband's death.

Other evidence casts doubt on the truthfulness of the defendant's story and is incriminating in its character. Every statement made by her, either on oath or otherwise, is to the effect that Hansen had already sustained the fatal injuries when she first went to the garage. On the early morning of September 10, in talking to Dr. Scott and Officer Burright and in her statement in the sheriff's office, she fixed the time of that visit at about 10:30. What she then said in this regard is fairly in accord with Edna Goheen's testimony that she heard the voices of the Hansens coming from the garage between 20 and 25 minutes to 11:00. She told Dr. Scott that she discovered that Hansen was dead at 12:00 o'clock. There is no explanation, consistent with the truthfulness of her story, of how she was occupied from that time until 1:30, or perhaps later, when she notified Mrs. Loveland. In her subsequent statements—to the district attorney on September 26, 1950, before the grand jury and upon the trial—she fixed the time of her first visit to the garage as between 12:20 and 12:30. This she supported by saying that she looked at the clock. From the testimony of Dr. Scott and Dr. Gearey the jury had the right to believe that death occurred at about 12:30. The jury had the right also to conclude that the defendant changed her story about the time to make it appear more reasonable. Even so, the jury could have found that the defendant had given no acceptable account of her actions in the hour that intervened before she summoned help. Moreover, her statements to Dr. Scott and Officer Burright in one important particular differed radically from other statements she made and from her testimony on the trial, for she told Dr. Scott

that, while she first found Hansen in the garage at 11:30 and then returned to the apartment to get some wash cloths, it was not until 12:00 o'clock that she went back to the garage when she found her husband dead. She told Burright that after discovering Hansen in the garage "she then went back to the apartment thinking that he would return in a little while. When he didn't, she went back again and his hand to the feel was cold."

■ The "unusual" and "extraordinary" actions and "unnatural and abnormal" conduct of the defendant in regard to the occurrence, together with the "unreasonable and improbable" explanations she gave of her actions, were circumstances to be weighed against her by the jury, in connection with all the other circumstances in evidence. *State v. Clark,* 99 Or 629, 645, 196 P 360; *State v. Zullig,* 97 Or 427, 431, 190 P 580.

There is evidence of "a sense of guilt." *State v. Clark,* supra, 99 Or 654. The defendant strenuously and repeatedly protested against calling the police. The blood on the garage door looked as though someone had tried to erase it. The defendant was seen cleaning the floor of the garage and the concrete pavement immediately outside the garage. The jury could have found that the defendant was trying to get rid of the blood— the evidence of her crime. The jury could further have found that it was the defendant's purpose to remove her husband's dead body from the garage and out into the driveway or the street so that it might appear that his death occurred elsewhere, and that she abandoned this purpose when she found it impossible to wipe out the blood and that the task was too great for her strength. Then in desperation she determined to arouse Mrs. Loveland and tell the story to which, with variations, she has adhered from the beginning.

With reference to the extra set of keys to the Hansen car found on the dinette table, the defendant, in her statement to the district attorney on September 22, 1950, said in answer to a question, that she did not know where those keys were at that time, that they might be in the compartment of the car (probably meaning glove compartment). She testified before the grand jury that one set of keys was upstairs in the apartment, and "I might even have had it in my purse," so that she could use them to open the car when it was locked; that she could not recall having seen the keys since her daughter Bjorg had visited her parents in August and used them when she drove the car; that they usually kept these keys on a little upper shelf in the dinette. On the trial the defendant testified that she had no recollection of having seen the keys on the night of September 9. On cross-examination she testified that she did not notice them on the dinette table when she got the cribbage board and put it on the table while the Tugmans were there.

She could not explain their presence there. It will be remembered that neither of the Tugmans noticed the keys on the table. From all the evidence on this subject it could be found that these keys were at times, if not ordinarily, in the custody of the defendant, or at least, that she knew where they were kept, and that they were not on the dinette table at any time up to 10:30 o'clock of Saturday night when the Hansens and the Tugmans left the apartment. They were discovered there early Sunday morning by the officers. The leather case appears in the photograph to be fastened, but the keys protruded as though they had been recently used by someone too hurried or too preoccupied to return them properly to the case. In the meantime the only person who had been in the apart-

ment was the defendant, and it was a legitimate inference, in connection with all the other circumstances of the case, that upon returning to the apartment she got the keys from their accustomed place for the purpose of using them in the perpetration of the crime charged against her, and that later, on one of the four or five trips she took between the garage and the apartment, she passed through the dinette to the kitchen to get a wash cloth, and in her overwrought state dropped the keys on the table, where they still were when the police arrived.

It is argued, however, that the defendant concededly did not know how to drive an automobile and, therefore, that it was impossible for her to have committed the crime in the manner charged. The defendant is an intelligent woman. She had a year of college in Norway, and for more than two years worked as a telegraph operator. She testified that she had never started or attempted to start a car, that when they first got a car while living in Coos Bay her husband would have liked her to drive but that she was too nervous. Mrs. Tugman testified that once, about fifteen years before, her father had attempted to teach the defendant how to drive but gave it up. For a period of some 15 years or more the defendant had ridden in the family car. The concession in the district attorney's opening statement was that "the family had owned a car for quite a few years, approximately 15 or so, but that Mrs. Hansen did not know actually how to operate a car, her knowledge being that of a passenger in a car while watching someone else operate it, but that she herself was not qualified to drive the car and did not have a driver's license." In view of the great weight of the evidence leading to the conclusion that the deceased met his death in the garage

when the car was backed into him, that the defendant was the only other person in the garage, that by her own statements she was present when he died, and that he could not have brought about his own death in that manner, the court cannot say that it was impossible for the defendant to have performed the act which someone unquestionably performed and which the evidence tends so strongly to show must have taken place when she and her husband were alone in the garage. Under great stress or the drive of a consuming passion, a person may succeed in doing a thing which, in ordinary circumstances, he would not even attempt; and we think the question here is not one for this court, but was for the jury.

The defendant argues that opportunity alone is not sufficient to establish guilt. This, of course, is true. But it must be evident to anyone who reads and analyzes the evidence in this case that there was a great deal more than opportunity for the defendant to have committed the crime with which she is charged. There were motive, statements of the defendant which tended to incriminate her, conduct which tended to incriminate her, and evidence of other circumstances which pointed to her, and her alone, as the perpetrator of the crime.

The court did not err in denying the motion for a directed verdict of acquittal.

*Theory of Unintentional Crushing*

Error is assigned to rulings of the court now to be considered.

The court, after instructing the jury that if they should find that the defendant "did feloniously, purposely, and of deliberate and premeditated malice, kill one Sigurd Hansen by crushing him with a motor

vehicle," then she would be guilty of murder in the first degree, gave this further instruction:

> "In this connection however, if you find from the evidence in this case beyond a reasonable doubt, that the defendant purposely intended to kill Sigurd Hansen at the time and place alleged in the indictment, and you further find beyond a reasonable doubt that she intended to accomplish such act by means other than crushing him with a motor vehicle as alleged in the indictment, and you further find beyond a reasonable doubt that in the attempt to kill said Sigurd Hansen by such other means, if you find she did intend to kill said Sigurd Hansen by some other means, and was engaged in an attempt to carry out said intent, she at that time with said intent then and there existing in her mind, did by accident cause his death by crushing him with a motor vehicle, then and in that event, if you find all other necessary allegations and elements of the crime charged in the indictment, or any lesser crime included therein, as I have heretofore instructed you to have been proven to your satisfaction beyond a reasonable doubt, the defendant would be guilty.
>
> "If, however, at the time of said accident, if you find there was such an accident, under the circumstances which I have just outlined to you, the defendant was not then and there engaged in attempting to carry out an intent to kill Sigurd Hansen by some other means, if you find she had such intent, the defendant would not be guilty of the crime charged in the indictment or any of the lesser crimes included thereon."

Under the foregoing instructions the jury were permitted to find that the defendant murdered her husband either by intentionally causing the automobile to crush him, or unintentionally while engaged in an attempt to kill him by other means.

The only "other means" suggested in the record

is that referred to by the district attorney in his opening statement to the jury when outlining a theory of the manner in which the alleged crime was committed. He told the jury that the defendant intended to bring about her husband's death by carbon monoxide poisoning from the exhaust of the automobile; that she wished it to appear that he had committed suicide; that to carry out this purpose she placed him, when he was in a helpless condition, behind the car with his face near the exhaust pipe; that she was not familiar with the operation of an automobile, except what she had learned as a passenger from watching others drive; that she pressed the starter button with the intention of starting the motor at a time when the car was in reverse gear; and that as a result the car was propelled backward by the energy from the battery into the victim's prostrate body.

At the conclusion of the testimony the defendant moved the court to take from the jury the theory embodied in the instruction last above quoted, on the grounds that evidence of a killing in that manner would be a fatal variance from the allegations of the indictment, and that there was no evidence to support a charge of a killing in that manner. The motion was denied. The defendant likewise excepted to the instruction on that subject.

■■ In our opinion the court's denial of the motion and the giving of the instruction constitute reversible error for the reason that the theory embodied in the instruction rests upon speculation. It requires an unfounded assumption that the car was in reverse gear at the time that the defendant got into it and started the motor, whereas there is no proof and no basis for an inference that this was the fact. The court cannot take judicial notice, as the state would have us do, that cars

are usually left in reverse gear when parked in garages. Nothing in common experience teaches us that this is so. We are told that the deceased had talked of suicide, that there is an age-old practice of the murderer trying to give to his crime the outward appearance of suicide, and that persons sometimes commit suicide by placing themselves near the source of the fumes from an automobile exhaust pipe. These considerations, together with the evidence showing that the face of the deceased came into contact with the exhaust pipe and that the car could have been moved backward on the energy supplied by the battery alone with sufficient momentum to crush the deceased, are suggested as adequate support for the state's theory.

There are, of course, numerous recorded instances of fabrication of evidence of suicide. A familiar device, both in fact and fiction, is to lay a discharged pistol beside the body of the victim. See, on this subject, Burrill on Circumstantial Evidence, 421. Here, however, the contention is that the defendant intended to fabricate evidence, but did not succeed. It rests in important part on the evidence which tends to show that the face of the deceased came into contact with the exhaust pipe of the car. But even that fact does not help to sustain the theory, because the only medical evidence on the point, supplied by Dr. Richardson, was that the injuries to the deceased's face, indicating contact with the exhaust pipe, "were all at the time or shortly after death." Unless there were some evidence —and there is none—to dispute this, there is nothing to show that the defendant placed the face of her husband, while still alive, close to the exhaust pipe. It was entirely permissible, on the other hand, for the jury to find that the face injuries were received after death, when the defendant was engaged in removing

the body of her husband from the place where it was crushed to the corner of the garage where it was found.

If the state is right in its contention that defendant dragged the body of the deceased to the rear of the car for the purpose of murdering him, and that she did murder him by causing the car to be driven against him, the natural inference is that she did what she intended to do; and there is nothing tangible which can be opposed to this inference as constituting substantial evidence of a killing by accident in the course of an attempt to kill by a different means.

## Claim of Variance

In view of another trial, we think it well to express our views on the contention of the defendant that proof of a killing by crushing the deceased with an automobile while the defendant was engaged in an attempt to accomplish the killing by carbon monoxide poisoning, in the manner outlined in the district attorney's opening statement, would constitute a fatal variance.

■■ We think it cannot be doubted that such an act would be murder. "When an intent exists to do wrong, and an unintended illegal act ensues as a natural and probable consequence, the uintended wrong derives its character from the general evil intent." 1 Wharton's Criminal Law (12th ed), 211, § 157. Illustrations from our own decisions are those cases in which the accused shoots at one person and kills another (*State of Oregon v. Murray,* 11 Or 413, 5 P 55; *State of Oregon v. Brown,* 7 Or 186). Another illustration is this: A man threw a large beer glass at his wife, who at the time held a lighted lamp in her hand. It struck the lamp and broke it, scattering the burning oil over. her person and igniting her clothes, as the result

whereof she died. A conviction of murder was upheld, for it made no difference whether the defendant had any specific intent; it was, as the court said, "sufficient that he manifested a reckless, murderous disposition,—in the language of the old books, 'A heart void of social duty, and fatally bent on mischief.'" *Mays v. The People,* 106 Ill 306, 313, 46 Am Rep 698. This is the principle approved in *State v. Murray,* supra, 11 Or ·420. See, to the same effect, *State v. Smith,* 2 Strobhart's Law 77, 47 Am Dec 589; *The People v. Goldvarg,* 346 Ill 398, 178 NE 892; *Norman v. United States,* 20 App DC 494. As taught by these and many other authorities, "A specific intent to kill does not enter into the definition of murder at common law or under statutes declaratory thereof." 29 CJ, Homicide, 1095, § 69. *A fortiori,* if there exists a specific intent to kill by a certain means, and in the use of such means death results by a means not intended, the crime of murder has been committed.

 The indictment here is in the form approved by statute. § 26-705, OCLA, form No. 1, Vol 3, p 314, OCLA. (These provisions, it should be observed, were repealed by Or Laws 1951, Ch 391, but were in effect at the time the present indictment was returned.) Proof that the plaintiff killed her husband in the manner and under the circumstances now being considered would be proof under the law that "she purposely and of deliberate and premeditated malice" killed him by "crushing him with a motor vehicle," precisely as the indictment alleges. In *State v. Cook,* 154 Or 62, 67, 59 P2d 249, this court stated the rule as follows: "Variance between allegation and proof which does not go to the extent of showing that the offense proved is not the offense charged is immaterial." There could be no fatal variance here, since the proof would be

only such as, when aided by the applicable principle of law, is in accord with the pleading.

On this question we find the closest analogy in those cases where one has killed another, mistaking him for a third person whom he intended to kill; or where one, while engaged in an attempt to kill one person, has killed another by mistake. Of such cases it is said in Wharton on Homicide (3d ed) 575, § 359: "And a charge that a murder was done wilfully, deliberately, and premeditatedly, and with malice aforethought, is sustained by proof that it was committed with a mind imbued with these qualities, though they were directed against a person other than the one killed." *Carpio v. State,* 27 NM 265, 199 P 1012, 18 ALR 914, was a case of this kind. The indictment alleged that the defendant maliciously and premeditatedly shot and killed one Rios; the proof showed that the malice and deliberation were directed against one Lucero. The contention was advanced that there was a variance because the indictment failed to allege that the malice and deliberation were directed against the person intended to be killed. The court rejected this contention, saying: "There is no merit in this argument, however, because under the law the malice and deliberation were transferred from Lucero to Rios. In other words, the malice followed the bullet."

So, in this case, the malice would be transferred from the attempt to kill by starting the motor of the automobile so that fumes from the exhaust would be inhaled by the deceased, to the unintended result of propelling the car against him and crushing him.

These views find further support in *State v. Casey,* 108 Or 386, 410, 213 P 771, 217 P 632, where the court said that, where the offense is killing, in the commission or attempt to commit any rape, arson, robbery

or burglary (§ 23-401, OCLA), it is not necessary to allege in the indictment that the defendant was committing or attempting to commit any of the felonies named in the statute. The opinion by Mr. Justice Brown, justly esteemed for his wide knowledge of criminal law, contains an extensive review of the authorities on the point and demonstrates that the conclusion reached is in harmony with the rule at common law and the decisions of most of the courts under statutes similar to ours. What seems to be an inconsistent dictum in *State v. Merten,* 175 Or 254, 259, 152 P2d 942, was not intended to overrule *State v. Casey* in this regard.

The defendant has cited authorities, the effect of which may be stated in the language of one of them as follows:

> "* * * If a person be indicted or appealed for one species of killing, as by poisoning, he cannot be convicted by evidence of a totally different species of death, as by shooting, starving, or strangling." 1 East, PC 341.

These decisions are not in point because the evidence in this case does not show "a totally different species of death" from that charged in the indictment, but rather an identical species, namely, "crushing with a motor vehicle." If evidence of the character under discussion should be offered on another trial it would be the duty of the court to admit it.

*First Degree Murder*

An assignment of error is based on the refusal of the court to withdraw from the consideration of the jury the charge of first degree murder. The claim is that there is no evidence of deliberate and premeditated malice. Part of the defendant's argument is

directed against the state's theory of a plan of the defendant to kill the deceased by carbon monoxide poisoning. We have already held with the defendant on that issue, though we also hold that, apart from it, there is sufficient evidence of guilt for the consideration of the jury, and therefore the defendant was not entitled to a directed verdict of acquittal. It seems to us to be entirely clear that the question whether there was deliberation and premeditation in the commission of the alleged crime was likewise for the jury. The existence of such malice in a killer's mind is the result of a mental condition, and is not subject to direct proof; it may be inferred as a matter of fact from the circumstances, conduct, language, the character of the weapon used, and the nature and number of wounds inflicted. It is ordinarily a question for the jury. *State v. Butchek,* 121 Or 141, 156, 253 P 367, 254 P 805. See also, *State v. Leland,* 190 Or 598, 637, 227 P2d 785; *State v. Ogilvie,* 180 Or 365, 376, 175 P2d 454; *State v. Cunningham,* 173 Or 25, 43, 144 P2d 303.

Defendant cites the case of *People v. Howard,* 211 Cal 322, 295 P 333, where the court, acting under a statute, reduced the judgment from murder in the first degree to murder in the second degree. The basis of the decision was that the evidence of guilt was furnished almost entirely by a confession of the defendant, and that, while the jury had the right to reject that portion of the confession which charged the deceased with having been the aggressor in a quarrel leading up to the homicide, if this were to be rejected then there was no evidence from which it might reasonably be deduced that the killing was the result of a willful, deliberate and premeditated intent to kill. The case at bar, however, is wholly different. The jury were justified in rejecting the exculpatory portions of the

defendant's statements and in accepting those portions which tend to incriminate her. There was then left, however, an abundance of other evidence which justified a finding of willful, deliberate and premeditated killing. The only other case cited by the defendant in support of this assignment of error is *State v. Morris,* 41 Wyo 128, 283 P 406. The facts and circumstances of that case are so entirely different from those with which we are here dealing that the decision is without value here as authority.

We are not to be understood as indicating our belief that a verdict of first degree murder in this case was such as we would approve if we had power to review the facts. A more charitable jury might readily have found a more moderate verdict. But the question was properly submitted to the jury as one of fact for their determination, and on another trial, under the same evidence, the same course will have to be pursued.

*Evidence of Emotion*

■ It is contended that the court erred in overruling defendant's objections to questions by the district attorney as to the attitude and emotions displayed by the defendant with respect to the calling of the police. The ground of the objections was that the questions called for the conclusions of the witnesses. That there is no merit in this contention is sufficiently demonstrated by our decision in *State v. Broadhurst,* 184 Or 178, 249, 196 P2d 407, cert. den. 337 US 906, 93 L ed 1718, 69 S Ct 1046.

The only other assignment of error, aside from one based on the order of the circuit court denying a motion for a new trial (which raises no question for review by this court), is directed to the overruling of an objection to a hypothetical question addressed to Dr. Richardson. The briefs contain no argument in

support of this assignment of error. We have examined the question, however, and are of the opinion that the court was right in overruling the objection.

Out of an abundance of caution, we repeat that in our discussion of the evidence in this case it has not been our purpose to express an opinion as to the guilt or innocence of the defendant, but merely to perform the judicial function of determining whether there was sufficient evidence of guilt to warrant submission of that question to the jury.

For the errors pointed out, the judgment must be reversed and the cause remanded for further proceedings in conformity to this opinion.

BRAND, C. J., concurring.

I concur in the decision and in the able opinion of Mr. Justice Lusk in his dealing with the facts and the law. Were I a juror duly empaneled and sworn to try the case in the circuit court and upon the present record I should no doubt be impressed by the argument in behalf of the defendant's case which appears in the dissenting opinions. Being mindful, however, of the limitations imposed by the constitution upon the scope of judicial review, I am unmoved by the recital of the testimony which is suggestive of innocence but which ignores much that tends to show guilt. My sympathies are strongly enlisted in this case, but it is of the essence of the judicial function that judgment must not be swayed by interest.

"* * * no fact tried by a jury shall be otherwise re-examined in any court of this State, unless the court can affirmatively say there is no evidence to support the verdict. * * *" Constitution of Oregon, Art VII, § 3.

Stripped of fine-spun argument concerning the "theory of the case", the question which the jury de-

cided and which only a jury should decide is—did the defendant kill her husband? I am unable to "affirmatively say there is no evidence to support the verdict."

ROSSMAN, J. (dissenting from the holding which remands for another trial)

I concur in the holding of the majority that error was committed when the Circuit Court submitted to the jury the State's contention that the defendant attempted to kill her husband with carbon monoxide gas. After the majority have so held, they remand the case for another trial. I am convinced that the record does not justify the majority in remanding the case, and dissent from that part of its ruling.

Before setting forth the reasons which convince me that the case should not be remanded for another trial, I express my conviction that the evidence does not show that the defendant had a motive for killing her husband.

### Motive

Normally, when husband and wife have lived together happily for many years, and it is claimed that one of them killed the other, the record includes facts indicating (1) threats; (2) that one of the spouses had transferred his or her affections to another; or (3) a covetous disposition upon the part of the mate accused of the crime and the existence of a large amount of life insurance or a large inheritable estate. The record before us is free from all such circumstances. The deceased had only $1,000 life insurance, and the record does not indicate to whom it was payable. The Hansens had two joint bank accounts; one, a savings account, had to its credit $2,000, and the other, a checking account, held about $250. Since both husband and wife worked, the accumulations in the accounts were evi-

dently the result of their joint toil. Those items, together with their automobile and a savings bond, payable at maturity, in the sum of $1,000, comprised the entire accumulation of the couple.

No one claims that either the defendant or her deceased husband had become interested in any third person, a circumstance which possibly indicates that the two were leading a reasonably happy married life.

There is no intimation that the defendant ever uttered a threat. The apartment house in which they lived was not soundproof and sounds carried through its walls into other apartments. The Hansens ate virtually all of their meals, including the one at noon, together in their apartment. Since they did but little visiting around, they spent most of their evenings in the apartment or in Mr. Hansen's workshop which occupied one of the apartment house garages. They had been tenants of the apartment house for four years. The two left together in the morning in Mr. Hansen's car when they went to work. They came home together in the same vehicle at noon and at the close of the day's work again rode home together. Thus, they afforded others many opportunities to see or hear them in quarrels if any serious difficulties marred their conjugal relationship. If either ever spoke a cross word or addressed the other in a loud voice, no witness mentioned the fact, with the possible exception of the single incident which is mentioned in the majority opinion. It will be recalled that the latter states that Edna Goheen heard the Hansens speaking loudly in their garage September 9 at about 10:40 p. m. That witness did not see the Hansens but heard voices coming from their garage, which she described as "quite loud talking and quite rapid talking." She added, "I distinguished no words." She knew the defendant only

by sight, and did not state, at least not expressly, that the voices which she heard were those of the Hansens.

The exhaustive search for evidence which the district attorney and the peace officers made following the death warrants the inference that if the Hansens ever quarreled or had any serious differences the prosecution would have become apprised of those facts. After Mr. Hansen's death the officers made a painstaking search to discover adverse circumstances. The apartment, the garage and the workshop were preempted for approximately two months. The automobile was seized and was still in the possession of the police for at least three months after the death. Three officers were detailed to scrutinize the apartment, the garage, the automobile and the workshop for evidence. They got down upon their hands and knees while searching through the grass and shrubbery adjacent to the apartment house. So completely did they take into their possession the defendant's belongings that it was necessary for her, when she sought a change of garments, to be accompanied by the sheriff, other peace officers and her attorney when she went to the apartment house. A large number of photographs was taken within two hours of the death showing scenes and objects which the officers deemed important. In the meantime, two officers, who were experts in the art of fingerprinting, sought to "lift" fingerprints off all promising objects. They found none except the deceased's. Within a very few hours of the death the director of State's crime detection laboratory came to the scene and from then on gave the case much of his attention. The bumper and the rear nine inches of the car's exhaust pipe were removed. Those objects and a large number of others such as wine jugs, vomit, a coffee table, blood stains, floor sweepings, and the defendant's underwear

were analyzed chemically and otherwise. In the meantime, the occupants of the apartment house were interviewed. In short, the death, its circumstances and every phase of the defendant's activities were subjected to the closest scrutiny which analytical police methods offer. Hence, I repeat, if anyone had ever heard the Hansens say an unkind word to one another, that fact would have come to the attention of the prosecuting officials.

The claim that the defendant had a motive for killing her husband rests entirely upon the facts that (1) on Saturday, September 9, at about 7:00 p. m., the Hansens were seen upon the street engaged in conduct which excited attention; (2) about a half hour later, when the Tugmans made their visit, the apartment was in a state of disorder; and (3) Mr. Hansen was plainly depressed in spirit. The evidence indicates that Mr. Hansen was subject to periodical attacks of depression and at those times drank wine. The events of September 9 which are material began at about four o'clock in the afternoon when Mrs. Hansen. came home from her work feeling exhausted and lay down upon a couch. Acting under the direction of a physician, she was upon a diet in an endeavor to relieve her obesity and high blood pressure. Reducing diets are ill adapted to promote good nature. In addition, she had suffered from a stomach disorder for three days. About an hour after the defendant entered the apartment, Mr. Hansen came home bringing with him an armful of groceries and vegetables, including two items which he had selected especially for the defendant. The thoughtfulness which he displayed in that particular shows that a cordial relationship existed between the two. Presently the defendant, upon the request of her husband, cut his hair and about the same time he

brought her a large glass of wine which he suggested would be beneficial for her. Drinking alcoholic beverages was rarely done by the defendant. She, however, drank the tendered glassful. She had eaten nothing since noon. Two wine jugs and their contents are exhibits in this case. One was taken by the police officers from the apartment and the other from the workshop. The contents of each was examined by chemists in the employ of the State. The wine in one of the jugs contained 17 per cent of alcohol and that in the other was found to be "fortified" wine. Mrs. Hansen readily conceded that the wine which she drank made her feel dizzy when at about seven o'clock she went to the street.

Sometime after Mr. Hansen had returned home he telephoned to his wife's physician and requested him to call upon the defendant. When it developed that the physician was not available, Mr. Hansen by long distance telephone summoned the Tugmans and told them that the defendant was not well. They responded to the call at once. The deceased's tender regard for his wife indicates that the two were upon affectionate terms. Both of the Tugmans declared that the defendant appeared to be very tired, a circumstance which could be due to her restricted diet and the fact that she had worked every day of that week. They also described Mr. Hansen as greatly depressed in spirit. Without detailing the circumstances further, I express my belief that they can readily explain the conditions which the witnesses, mentioned in the majority opinion, observed. Those conditions were unfortunate and very likely all regretted them, but the circumstances just mentioned account for them without attributing to the Hansens any ill will for each other. In short, they do not show

that either had lost affection for the other. That is the only fact material to this case.

Surely the episode just mentioned upon which the majority dwells, and which was not caused by an absence of devotion upon the part of either mate for the other, cannot warrant a holding that the defendant had a motive for killing her husband. Normally, when husband and wife have lived together happily for a score of years and have reared successfully three fine children, one of them does not become suddenly seized with a desire to kill the other. Motives to kill germinate slowly, unless the parties are engaged in a heated controversy. When the faintest thought of killing another enters the mind, it is quickly repulsed. It cannot reappear unless in the interval it has fed upon hate, jealousy or mistrust. In short, affection which has undergone the test of years does not change suddenly into an urge to kill. There is nothing whatever in the record which shows that the defendant ever wished any sort of misfortune to befall her husband. No one claims that she disliked or mistrusted him. To the contrary, the record shows that she was a faithful and intelligent helpmate. She was proud of her children and spoke of her husband's fine lineage.

The record contains much evidence which shows that, apart from the defendant's objections to her husband's use of wine and his inclination to dejection when he periodically resorted to his wine jug, the two led a happy and successful married life. Friends of the Hansens, as well as members of their family, gave direct testimony to that effect. I shall now make a brief review of it.

The Hansens were married in 1922 in Norway, where their three daughters were born. While the children

were still infants, financial ruin overtook the father. In searching for new opportunities for himself, and under a belief that the New World offered superior educational facilities for children, Hansen came to the United States. In the meantime, the defendant and the three children made their home with the father's parents. The financial depression which had brought reverses to Hansen's efforts in his native land denied him, here in America, the longed-for success. Three and one-half years after he came to the United States he returned to Norway where he made a new attempt to establish himself. After a few months' efforts in Norway he returned to America and obtained employment in Pontiac, Michigan. Before long he left Pontiac and came to Coos Bay in this state where a brother of the defendant lived. His employment in Coos Bay was in menial tasks at low wages, but by 1934 Hansen had accumulated enough so that he was able to send for his wife and children. They reached Coos Bay June 2, 1934. By that time the eldest daughter was eleven years of age and the two younger ones, who are twins, were nine. Upon coming to Coos Bay, the three children, as well as their mother, were wholly unfamiliar with our language. Since they arrived in the summer school vacation period, an earnest effort was made to impart to them sufficient familiarity with the English language so that when school opened in the fall the children were able to enroll.

All three of the children proved to be bright students and made rapid progress. Upon graduating from the local high school, two entered the University of Oregon and the third Oregon State College. In due time the three graduated from the institutions. All three always received high grades. Two of the girls, who later received instruction in Union Theological Seminary,

are now secretaries of the Y. W. C. A. The eldest is the wife of a graduate of a professional school. The record indicates that the parents were always proud of their daughters and constantly lent them encouragement in their educational efforts. The defendant made their clothing and, through careful management, enabled her husband's small wages to meet all needs. She even accepted the employment in which she was still engaged at the time of her husband's death so that the children could have spending money while in college. It is plainly evident that the parents' happiness had to come to them through their mutual affection and the satisfaction derived from their children's progress. They had no means whereby they could gain happiness from any other source. Children do not achieve the success of the three which we have mentioned in the absence of happy home conditions, accompanied with a family spirit which encourages them to put forth their best endeavors while they strive for the enduring satisfactions of life. The Hansen home must have been a harmonious one. Meanness, baseness and unworthy purposes evidently never entered it. The parents set as the goal for the family's common endeavors achievements worthy of inscription upon sacred edifices. Evidently the defendant discharged her full part in imparting to the children high aspirations, for, it will be recalled, she had exclusive custody of them until the two younger ones were at least nine years of age.

About the time when the children had completed their schooling Mr. Hansen established himself in a small business in Corvallis, which consisted in part of repairing electrical appliances and doing odd jobs. The majority opinion mentions his shop, which was nothing other than one of the garages which formed a part of the Wilder Apartments. His shop and garage

were adjacent to one another. He frequently worked in the shop until late hours of the evening.

The defendant testified that as long as the family was restricted to the close "budget" which it had to observe while the children were obtaining their education, the purchase of a home could not be considered, but she added, "The next accomplishment after we felt we had the girls' education finished, then the next step of our lives was to get our own home over here." Sometime prior to September 9 the Hansens had viewed some lots and by September 9 had selected the one which they preferred. They had discussed plans for their new home, and in their apartment at the fatal hour were plan books which they had consulted. While the Tugmans were making the visit mentioned in the majority opinion, the telephone rang and when Mr. Hansen answered it he made an engagement with a real estate man for Monday as the time for consummating the purchase of the lot. Thus, at the very moment when the State claims that the defendant was intent upon killing her husband, the Hansens were about to purchase a lot and construct upon it their home. Without pursuing this matter further, I repeat that the record contains no evidence whatever showing that the defendant had a motive for taking her husband's life. It does not indicate that she ever manifested toward him an inimical attitude or desired that any harm should befall him. If the incidents described in the majority opinion can be deemed proof of motive, then every woman who is married to a man who periodically drinks likewise has a motive for murdering him.

### Sense of Guilt

It will be recalled that the State contends that the defendant not only killed her husband, but also en-

deavored to make it appear that he had committed suicide. The majority attributes to the defendant a sense of guilt. It declares she wiped away the blood so as to induce those who might come upon the scene to draw erroneous conclusions as to the place and cause of death.

After the death, the defendant went to Mrs. Loveland, the manager of the apartment house, and sought help. At that time there were, in plain view, upon the defendant's dress, shoes and stockings, large blotches of blood. Mrs. Loveland saw them, as did others who shortly came upon the scene. If the defendant's purpose in wiping blood from her husband's face was to conceal the purported crime, it is impossible to understand why she neglected to change her clothes before calling upon Mrs. Loveland. Shortly, when the sheriff and police officers came to the place, the defendant described to them, voluntarily, the manner in which she had wiped away blood, and told the investigators that blood had flowed from her husband's ears, mouth and nose. Thus, far from endeavoring to conceal the fact that her husband had bled, she told about it.

The prosecution claims that the defendant sought to make it appear that her husband had committed suicide. If the defendant intended to make the death appear to have been a suicide, she was afforded an excellent opportunity within two hours after death occurred to serve that purported purpose. I shall explain. The local coroner reached the scene of the death at 2:15 a. m., and presently he had, what he termed, "quite a conversation" with the defendant. In its course he asked her "rather pointedly", so he said, "Mrs. Hansen, do you think that your husband killed himself?" Her answer, according to the witness, was "No". A few days later, the defendant was questioned

extensively in the office of the local district attorney by that official, in the presence of three police officers and her own attorney. Neither the defendant nor her attorney interposed any objections whatever to the numerous questions which were propounded, not only by the district attorney, but also by the police officers. During the questioning the defendant was asked whether her husband had ever mentioned suicide. She replied that at times, when he was drinking, he would say, "I am no good for the family; I am tired of life." But that he made statements of that kind only when he was drinking and that they did not worry her. She added that she always told him, "Please, Sig, don't you ever talk like that again." When she appeared before the grand jury, she was asked a similar question and made a similar reply. Thus, it is seen that she spurned repeatedly opportunities afforded her for embracing the suicide theory, had she been inclined to fabricate. She swore that when her husband was not drinking he was "a very happy man" and "proud of his family".

During the probes just mentioned the defendant was asked whether Mr. Hansen had any enemies, and answered "no". She likewise was asked whether he carried large sums of money upon his person, to which she replied in the negative. Seemingly, the questions about suicide induced the officers to inquire "He didn't have a gun?" She replied, "No, he never had a gun." Then the deputy sheriff asked her: "Mrs. Hansen, have you ever had occasion to suspect Mr. Hansen might be having affairs with other women?" She replied: "No, definitely. I never know that he left me for an hour. I know absolutely he was faithful in every way to me. I mean, that is something that I never worry about. I know he never surely would have anything like that

on his mind." The peculiar grammatical construction will be noticed. Witnesses declared that it was difficult to understand Mrs. Hansen on account of her Scandinavian accent and grammatical construction.

It is unnecessary to go on. Surely, if the defendant had in mind to disguise the death as suicide, she would have embraced the repeated opportunities afforded her. She spurned them all. In addition, she rejected numerous other opportunities which were afforded her to cast suspicion upon an "enemy", a robber or some other evil person. In short, I do not believe that the majority are warranted in their statement that the evidence indicates that the defendant displayed a sense of guilt. To the contrary, the lengthy and detailed statements which she gave to the district attorney and to the grand jury indicate very clearly that she had nothing to hide.

*Death did not occur in the manner claimed by the State*

The State claims that the defendant entered the garage about 11:00 p. m. and found her husband lying upon the floor in a state of helpless intoxication. Blood taken from his body was found to contain 0.27 grams of alcohol for each 100 cc's of blood, according to the State's expert. That quantity of alcohol, so the witness just mentioned said, would influence the movement of any person and would make many individuals "drunk". According to him, "We have had them sent in and die from that amount of alcohol in their blood." He expressed the belief that the decedent was drunk at the time of death. The State contends that after the defendant had found her husband in a helpless condition she dragged him to a place between the rear bumper of the car and the nearby door of the garage, preparatory to killing him. I shall now give the State's further contentions in the words its district attorney uttered while

he was making the State's opening statement to the jury. He said:

> "She placed him in this corner between the door and the bumper with a clearance of approximately 14 inches, and that she then put him in a position of a semi-sitting, semi-prone—not sitting erect, not flat on the floor, you might say halfway in between. That she then went around here and opened the front door of the car. \* \* \* That she pushed the starter button trying to start the car, and that the car in fact at that time was in reverse gear. That the car rolled back when she pushed the starter button, in this direction, and that the bumper caught Sigurd Hansen across the chest. \* \* \* That the force from that starter moving that car was such that it immediately forced all the air out of his lungs so that he was unable to make any sound whatsoever, \* \* \* ."

The State's theory was not that the defendant intended to kill her husband by backing the car upon him, but that she had intended to start the motor and have the exhaust fumes poison him. It claims that the defendant, being unfamiliar with the operation of an automobile, unwittingly caused the car to back up through the power supplied by the battery, when, in fact, she had intended to start the motor.

The excerpt which we just quoted from the district attorney's statement, as well as the recitals of the majority opinion, render it clear that the State contends that the rear bumper of the car crushed the deceased's chest and thereby brought death to him.

The lower edge of the bumper of the Hansen car was 13½ inches from the ground. Hansen was five feet, eight inches, tall. Dr. Richardson, director of the State's crime detection laboratory, performed an extensive autopsy upon the body of the deceased. He

swore that the third, fourth, fifth, sixth and eighth ribs on the right side and the fifth, sixth, seventh and eighth ribs on the left side were fractured. The eighth rib is near the abdominal cavity. The following is taken from Dr. Richardson's testimony:

"Q Did you determine from the injuries what position the body was in when it received the injuries?

"A The body was either upright, it was in an upward manner, upward fashion, as drawn.

"Q In an upright position?

"A Yes."

He added that he, of course, did not know where Hansen lay nor the position in which he was posed when death came to him.

Obviously, it is necessary for any victim who is seated upon the ground to be in an upright position if his eighth rib is to be fractured by the bumper of an automobile, especially if the individual is only five feet, eight inches, tall. When a person is seated upon the ground in an upright position, his eighth rib is as near to the ground, if not nearer, than the lower edge of an automobile bumper. If the person's position is not upright, or if the object against which his back rests yields under pressure, it is impossible for a bumper, upon backing against him, to fracture any of his ribs except possibly those in the mid-chest area.

Dr. Richardson was shown a photograph (Exhibit A) taken of Hansen's body lying in the garage in the exact position in which it was found by the police when they came upon the scene. No one had disturbed the body after Mrs. Loveland was summoned to the garage by the defendant. I now quote from Dr. Richardson's testimony:

"With the body in the position in the corner here as demonstrated in Exhibit A, and the car moving backward and the body in that position, the injury would not result with the body in the position as it is in Exhibit A."

A glance at Exhibit A shows that the bumper was so high that it would have passed over Hansen without touching any part of him except possibly his head.

By reverting to the district attorney's opening statement, it will be recalled that he did not contend that Hansen was seated upright when the bumper purportedly struck him. His exact words were "semi-sitting, semi-prone—not sitting erect, not flat on the floor, you might say half in between." His words were not slips of the tongue but were carefully chosen. Plainly, a man besotted with wine could not sit upright. His condition would render him prostrate or recumbent. The State expressly claims that Hansen was reclining partly against the door and partly upon his flexed left arm. The State was forced to take that position because (1) it claimed that Hansen was helplessly drunk; (2) it had to account for the fact that more ribs were broken upon the right side than upon the left; and (3) it had to assign to Hansen a position in which the rear bumper of the car would exert upon its victim an upward pressure. The significance of the purportedly upward pressure will shortly be developed. A simple experiment with one's self will readily show that if Hansen was slumped against the door and was resting in part upon his elbow, the bumper could not have struck his eighth rib. Let us bear in mind that the eighth rib on each side was fractured. If Hansen was in the position which the State contends, the bumper of a car might have come in contact with his shoulders, but, if so, it would not have produced the

results which Dr. Richardson swore he found, and which I shall presently describe.

The theories and deductions of Dr. Richardson are the mainstay of the State's case. He reached them after he had made a dissection of the deceased's body. He deduced that "some tremendous force" struck Hansen in that part of the chest which extends from the eighth rib to and including the third. Dr. Richardson employed many times the expression "tremendous force". He explained that the "tremendous force" had to be not only horizontal in direction but also upwards. He stressed the word "upwards". According to him, the tremendous force, moving not only horizontally but also upwards, produced instantaneous death. It afforded no opportunity for the voluntary utterance of a sound. The force was so great, according to Dr. Richardson, that no human power could have accounted for it—it had to be mechanical. After he had distinguished between a "sustained" pressure and a "sudden" pressure, he said, "I feel it was a sudden pressure" that caused the death. Presently he spoke of it as "a sudden crushing injury".

All of the above was essential to Dr. Richardson's theory, as I shall now show. According to him, the "tremendous pressure" which suddenly struck Hansen forced all of the blood in his body above the eighth rib into the shoulder muscles and skull. It likewise forced the air out of the lungs into the parts above the lungs. The following is taken from his testimony:

> "My opinion is that first, a crushing injury or some injury hit the chest, blowing the air upwards, and that it was an upward motion or hit something to cause it to pop the lungs upwards and not have the air shot downwards into the remainder of the body. It didn't shoot into the legs. It shot up into the head and up into the shoulder areas here, this

neck muscle. * * * My opinion the wound that caused death was the crushing injury to the chest cage and the resultant emphysema, air embolism, and so forth, popping and crushing the lung tissues.''

Having given that testimony, he was asked, ''What actually happened to the lungs, in layman's language?'' He answered, ''Well, they blew up inside of the body like a balloon.''

Dr. Richardson found nothing except normal conditions in the areas below the eighth rib. There were no excessive quantities of blood and no air bubbles in the abdomen and lower limbs, but he discovered air bubbles in the tissues of the chest, the outer surface of the lungs in the neck and head. Likewise, he found such an unusual amount of blood in the chest and neck muscles that they were discolored. Going on, he added, ''These multiple blood vessels that compose the brain and the vital centers of respiration all had hemorrhage about them.'' In that way, he showed that the sudden burst of blood which was forced upward by the tremendous pressure was larger in volume than the blood vessels could hold.

In addition to giving the above description of the conditions he found, Dr. Richardson testified that ''The lungs themselves were broken on both right and left sides * * *. Each of the lungs were torn and ripped.'' Although he found no direct injury to the brain, yet, referring to it, he mentioned ''pinpoint areas, all of which were filled with air.''

It is seen that Dr. Richardson described a ''tremendous pressure'' which struck the chest of the deceased in a horizontal and upward direction with such violence and suddenness that it forced the blood and air upwards. Under the pressure, the lungs burst and

emitted air into the tissues of the shoulders, neck and head. The blood took not only the course which has already been mentioned, but also the one which I will now describe.

When the blood was violently forced out of the chest area into the neck and head, it burst out of the mouth and ears. So Dr. Richardson swore. Evidently the parts of the arterial system which are in the shoulders, neck and head are not designed to contain the quantity of blood which the tremendous pressure forced into them; therefore, it had to force an outlet. Propelled by the great pressure, the blood flowed out through the ears and mouth. But it did something more, according to Dr. Richardson. He testified:

> "Well, that particular time the eardrums could have broken and small blood vessels, which are arterials or tubes, could have popped and squirted out blood."

He gave more testimony upon the subject, but the foregoing suffices for present purposes. Thus, it is seen that Dr. Richardson believed that it was possible that blood squirted out of the deceased's ears when the bumper supposedly struck his lower chest.

Dr. Richardson thought that a car bumper was capable of inflicting the injury which he had described, provided the car, in moving backward, exerted a pressure of 500 or 600 pounds. He called attention to the fact that the upper and lower sections of the Hansen bumper, when viewed crosswise, curved in materially toward the car. Dr. Richardson thought that the curvature could have assisted in effecting the upward pressure necessary to the infliction of the injury. He also thought that it was necessary that Hansen was in a semi-reclining position when the bumper collided with him; provided, of course, that it did collide with him.

The natural curvature of the spine, the curved areas of the bumper and the supposedly semi-reclining position of Hansen enabled the bumper, so Dr. Richardson believed, to exert the needed upward pressure. In that way, Dr. Richardson's theory and deductions accounted for the conditions which this opinion has mentioned. I pause to observe that, since the lower half of the bumper curved inward materially, the eighth rib of one who was seated upon the ground would not have been touched by any part of the bumper except its central part, if the person was sitting upright. If he was in a reclining position, such as the one essential to Dr. Richardson's theory, the bumper could not have touched his eighth and other lower ribs.

The State presented evidence which, it contends, shows that blood did in fact spurt out of Hansen's ears and spattered in numerous small drops on the lower lefthand corner of the garage door. By lower lefthand corner, I have in mind a person standing in the garage and facing the door. Hansen's body was found near the lower lefthand corner of the garage door. The spattered small drops of blood on the lower lefthand corner of the garage door are highly important. I shall now consider them.

One of the State's witnesses, when asked whether he saw "anything unusual" about the spattered drops just mentioned, answered that the shape of the drops indicated "upward travel". He added, "In other words, I might explain that the shape of the blood spots in certain instances, the heavy part of the spot being to the downward part and then a long thin trail leading from that out, indicating the direction of travel as the blood landed on that surface." Next, he said that he detected indications which showed that an effort had apparently been made by someone to wipe

blood off the lower part of the door. Further, the witness testified: "The most blood seemed to be in a splattered appearance in a lower portion of the southernmost section of the door." Those splattered drops reached a point, according to him, "about 14 inches in height." Near them he found "another area a little higher." The witness thought that the spots showed that blood had spurted out of a source lower than the spots; in other words, the blood spurted upwards. Another witness for the State, Jack Bearss, also described the spattered drops of blood upon the door. He referred to them as follows: "Down in this corner which is the lower left corner from the floor up about eight inches, small reddish-brown spots appear. And they had the appearance of being made from the bottom up. In other words, they struck out to a thin line at the top from about eight inches from the floor."

A photograph was made of the area of the door to which the two witnesses had referred. Below is a copy of it.

The irregular circle which appears upon the photograph was drawn by Bearss, who is the assistant director of the State crime detection laboratory. Bearss also drew in the circle the two letters "U U" which appear on the photograph. He placed the circle upon the photograph to indicate the area from which he took samples of the spattered blood. Before the photograph was taken, a ruler was placed within the area photographed. It appears on the right edge of the latter and is 12 inches high. The 10-inch mark upon the ruler is at the exact point of the lower molding of the panel. None of the spattered blood, therefore, appears to have been more than 14 inches above the floor. Some of the spots were as low as eight inches, and it will be remembered that one of the two witnesses

just mentioned thought that someone had wiped out spots still lower.

The photograph to which I have just referred is a part of the record and is there identified as State's Exhibit GG. The small blood spots which Bearss recovered became identified as Exhibit UU2. The State deems the spattered blood spots as highly important

and as constituting one of the chief features of the evidence. I now quote from its brief:

> "Perhaps the most important single piece of evidence establishing the corpus delecti [sic] is State's Exhibit GG, being an enlarged photograph of the blood spots on the inside of the garage door, which, when analyzed as Exhibit UU2 was identified scientifically as being human blood (Tr.p.593). An examination of GG discloses clearly that the blood was sprayed in an upward direction as evidenced by the location of smaller specks of blood above larger ones, this being a natural phenomenon when a liquid is sprayed, the smaller particles 'bouncing' from the larger ones along the direction of the line of force. There is no possible explanation other than that this blood was sprayed upward to create this physical fact. When tied in with Dr. Richardson's testimony that the pressure applied to the victim's chest was such that blood could spray from his ears, and also when considered in connection with State's Exhibit Y, being a close-up of the right side of the face of the victim wherein blood clearly appears inside the ear canal, the conclusion becomes irrefutable that it was the victim's blood."

It will be observed that the State's brief deems the spattered blood drops as "perhaps the most important single piece of evidence". The language just quoted says that the drops show that "the blood was sprayed in an upward direction * * * this blood was sprayed upward".

I agree that Exhibit GG and the blood spots shown by it are highly important, but I am satisfied that they refute conclusively the State's contention that Hansen was in the position attributed to him by the State when his life was taken. It is impossible that he was in such a position if blood burst from his ears and, moving upward, spattered upon the door. The lower edge of

the bumper was 13½ inches above the floor. If the bumper struck Hansen's chest, his ears must have been at least a foot higher. Therefore, if blood spurted out of his ears, it would have spattered upon the door no lower than 25 inches above the floor. Yet, as will be seen by reverting to the photograph, the larger blood spots were eight inches above the floor and none were higher than 14 inches. Some, which had been partially effaced, were even lower than eight inches. If those blood spots spurted out of Hansen's ears, his head must have been on the floor adjacent to the door. No other conclusion is possible. Yet the State repulses all contentions that Hansen was lying on the floor or roadway when he was struck. As a matter of fact, the left side of his shirt was torn and there were rubber marks upon the shirt which a chemical test showed came from an automobile tire. For the foregoing reasons, I am satisfied that the death did not occur in the manner claimed by the State. But there is still another reason.

*The record contains no evidence showing that the*
*Hansen car caused the death*

It will be recalled that the State claims that the defendant planned to cause her husband's death by carbon monoxide poisoning and that, while intending to start the motor, she unwittingly caused the car to back up through the energy supplied by its battery. At that instant, according to the further theory of the State, the deceased was slumped against the garage door to the rear of the car. Previous paragraphs of this opinion take notice of Dr. Richardson's testimony that a "tremendous pressure" was necessary to have caused the injuries which he found when he dissected the deceased's remains. It will be remembered that he expressed the belief repeatedly that the pressure

which delivered the fatal blow had to be, not only tremendous in its power, but also sudden in its application. A sustained pressure could not have produced the kind of injury which Hansen received, so Dr. Richardson swore. In addition to declaring that no human power could have inflicted the injury, Dr. Richardson ventured the belief that a mechanical device, exerting a pressure of 500 or 600 pounds, might have been sufficient.

The State claims, as we have seen, that, through energizing the car's battery, the defendant backed up the car upon her husband and thereby delivered to him the "tremendous pressure" which crushed out his life.

The record contains no evidence whatever that the battery in the Hansen car was capable of delivering the tremendous pressure which was essential to crush the deceased's chest. To the contrary, when experts in the employ of the State attempted to test the battery of the Hansen car for the purpose of determining whether it could have exerted the required pressure, they found that the battery was completely exhausted. It gave off not even a single electrical spark. The test was made by Oscar A. White, research engineer for the Materials Division of the Oregon Highway Commission. When Mr. White made the test, he was accompanied by the district attorney and three peace officers. He found that the Hansen battery "showed no charge in any cell." He then resorted to another battery which he termed a "booster battery" and with it sought to recharge the Hansen battery. After his efforts had continued for "possibly ten minutes" he found that the Hansen battery was completely spent and would not recharge. The effort was then discontinued.

The experiment which I have just mentioned was made December 7. The death occurred the previous September 9. In the meantime, the Hansen car had been in the exclusive possession of the State. The record discloses that, upon assuming possession, the State moved the car from the Hansen garage to one of its own choice and returned it to the Hansen garage so that Mr. White could make his experiment. In moving the car, the State towed it, that is, it did not operate it upon its own power.

December 7, when Mr. White discovered that the car's battery was exhausted and could not be recharged, he removed it and substituted in its place the booster battery. No one testified whether or not the booster battery was of the same voltage or manufacture as the one which had been taken out of the Hansen car. Nor is there any evidence as to the condition of the Hansen battery on the night of September 9.

After Mr. White had substituted for the Hansen battery his booster battery, he then made a test which I shall now mention briefly. He had brought with him, what he termed, a weighing device. He described it as a calibrated spring. He placed the device between the rear bumper of the Hansen car and the garage door immediately to the rear. After he had done so, the car's starter button was energized and when the car, operating upon the substituted battery, backed up, the calibrated spring registered 500 pounds. Then the experiment was repeated. The second time the register indicated 590 pounds. As a result of the experiment, it is claimed that the Hansen car was capable of applying the tremendous pressure which Dr. Richardson swore was necessary to have inflicted the injury which the deceased received. I am satisfied

that the evidence does not so indicate. It goes no further than to show that the "booster battery", but not the Hansen battery, was capable of exerting a tremendous pressure. So far as this court knows, the Hansen battery, on the night of September 9, may have been capable of doing nothing more than generating a few electrical sparks.

It will be recalled that Dr. Richardson swore that the blow which crushed the deceased's chest had to be, not only a tremendous one, but also sudden in its application. Mr. White's experiment showed that the booster battery was capable of delivering a pressure of 500 or 600 pounds, but indicated nothing concerning the suddenness with which the pressure was delivered.

Still another fact remains for mention. When Mr. White made his experiment, the space between the rear bumper and the garage door was unoccupied. Therefore, it was available so that the car, in backing up, could achieve momentum. Velocity is indispensable in the creation of power. The space between the bumper and the door, according to a witness who made careful measurement, was only 10 inches. Projecting beyond the bumper were two bumper guards of the kind which are usually seen upon cars. They extended two or two and one-half inches beyond the bumper, thereby reducing to that extent the available space. If we ignore the guards, there was available to the car, in a movement to the rear, only 10 inches. If a human being lay to the rear of the bumper and against the door, his body would, of course, materially reduce the 10-inch space, if it did not, in fact, occupy all of it. It is true, as the majority opinion says, that the door would "give" three inches or so when sufficient pressure was applied to it, but before the door could give, the car would have to move and hit the door. No one

testified that even the booster battery could have moved the car if a body was wedged in between the bumper and the door. Much less did anyone indicate that the car could have achieved sufficient velocity in the available space to be capable of delivering the sudden blow which Dr. Richardson swore was essential to the death. Let us bear in mind that he swore that a sudden, not a sustained, pressure was essential.

Without analyzing the evidence further, I express my conviction that it fails to prove that the death occurred in the manner claimed by the State. In fact, it shows convincingly that the death could not have occured in that manner. It is not amiss, however, to add that the tear in the deceased's shirt, the tire mark found upon it, and the fact that the deceased's upper plate had somehow been forced partly into the roof of his mouth are all circumstances which may indicate a manner of death very different from the one deduced by Dr. Richardson. The latter, although mentioning the tear in the shirt, the tire mark upon it and the impacted upper plate, did not attempt to account for any of them. The majority opinion attributes to counsel for the defendant a statement, in his argument before this court, that "there was ample evidence that Hansen's death occurred in the garage." The attorney who made the statement did not represent the defendant in the trial court. Defendant's printed brief says: "The most that can be said for the evidence in this case is that Mr. Hansen's death may have occurred in the garage."

The conclusions and deductions expressed by me in the foregoing paragraphs are not dependent upon evidence which a jury could have rejected. They are based upon testimony given by witnesses for the State or upon uncontradicted and unchallenged testimony

given by the defendant. I have availed myself only of evidence which neither a judge nor a juror could ignore. The physical facts of this case about which there can be no dispute show that the death could not have been caused by the bumper of the car while the latter was in the garage.

The majority orders the case remanded for another trial. Surely the State presented during the trial all of its evidence. As I pointed out, the death was followed by a painstaking and thorough investigation. There is no reason to suppose that the State withheld part of its evidence and will present it upon another trial. Even in civil cases a plaintiff must offer all of his evidence at the trial. We have repeatedly held that he cannot experiment with a part of his proof upon a first trial and then, if the experiment proves unsuccessful, win, at our hands, the right to a second trial.

The best that can be said for the State's case is that the death is a mystery, but mysteries are never submitted to a jury for solution. They may be solved by fiction writers, but neither fiction nor mystery can support a verdict of guilt. If, when all of the evidence has been analyzed, the man on the bench finds no substantial evidence capable of overcoming the presumption of innocence and of pointing to the defendant as the wrongdoer, he cannot submit the case to the jury.

I have carefully read, considered and analyzed the entire record. My examination of it satisfies me that the State failed to prove the guilt of the defendant. I, therefore, believe that the reversal should be accompanied with the entry of an order of dismissal.

TOOZE, J., concurs in this opinion.

LATOURETTE, J., concurring in part and dissenting in part.

I agree with the majority that this case should be reversed, but I would put the reversal on an additional ground, and that is that there is no substantial evidence to connect defendant with the alleged homicide.

We must remember that the conviction of defendant is based on circumstantial evidence, and that the finger of guilt must point unerringly to her before she may be found guilty. If there is any reasonable hypothesis for the death, other than that charged in the indictment, defendant cannot be found guilty. The burden of proof is upon the state to dissipate every other reasonable theory of death.

As stated in the prevailing opinion, opportunity alone is insufficient to warrant conviction. My view is that the defendant had the opportunity to kill her husband, but that the state failed to prove that she was capable of committing the act charged.

The state had no confidence in the theory, now adopted by the court, that the evidence is sufficient to warrant a finding that the defendant backed the car in a normal fashion into her husband. It embraced the theory, and adhered to it, throughout the trial and in this court, that defendant was seeking to asphyxiate her husband by the exhaust gas from the automobile, and the gear shift being in reverse, the car was accidentally propelled, through the energy of the battery, backward into decedent.

The prevailing opinion reverses the case because that theory was submitted by the trial judge to the jury. I quote:

"In our opinion the court's denial of the motion and the giving of the instruction constitute reversible error for the reason that the theory embodied

in the instruction rests upon speculation. It requires an unfounded assumption that the car was in reverse gear at the time that the defendant got into it and started the motor, whereas there is no proof and no basis for an inference that this was the fact. The court cannot take judicial notice, as the state would have us do, that cars are usually left in reverse gear when parked in garages. Nothing in common experience teaches us that this is so.''

The state's theory, taken from its brief, follows:

''As to the facts establishing premeditation, malice and the basis for the State's theory that the defendant intended to take the life of the victim through the use of carbon monoxide, the propositions being inseparable as far as evidence is concerned, the following clearly establish all of them.

''It is common knowledge that carbon monoxide is frequently employed to commit suicide, and that many persons resorting to this means of self-destruction locate themselves near the source of the exhaust fumes. It is also common knowledge, based on human experience, that persons whose intent is to commit homicide often attempt to disguise it as suicide. It is also common knowledge that cars parked in garages are often left in gear, especially reverse gear, so that when the vehicle is started it will move, if at all, back out of the garage rather than against the wall in front of the car.

''The matter of differences between the defendant and the victim has already been discussed. The record also shows that the defendant knew that the victim had talked of committing suicide, and had discussed the same with others, particularly William Tugman, Jr., the defendant having been in the small apartment of the Hansens with the Tugmans during the time of their visit when the victim discussed suicide.

''It is also evident from the facts that the victim could not possibly have taken his own life in the

manner in which he met his death, this being a physical impossibility.

"* * * * * *

"That the defendant did not know how to drive a motor vehicle is undisputed. However, she had been a frequent passenger in a car for about fourteen years and would presumably have an understanding as to the operation thereof.

"* * * * * *

"It should be noted that it is most unusual to take the life of a human by crushing them between a bumper and a closed garage door, a person intent on homicide normally employing some other means such as stabbing, striking, etc.

"* * * * * *

"The facts are so inter-related in the case that it should be borne in mind that those substantiating the corpus delecti, previously set forth, and those to follow relative to the establishing of the homicide by the accused are also important in the overall picture of proving premeditation, malice and the basis of the State's theory of homicide attempted to be disguised as suicide."

If we cannot assume that the gear shift was in reverse, as the prevailing opinion holds, how in the world can we assume that a woman, concededly having never driven a car, got into the vehicle, inserted the key in the switch, turned it, not to the left, which would not have started the engine, but to the right, pressed the starter button, put the gear shift in reverse, eased the car backward without noise, sufficiently to kill her husband (as Dr. Richardson said, 500 or 600 pounds pressure), then put the gear in forward and eased the car ahead to its previous position with the front bumper almost to the wall of the garage?

It is submitted that defendant, having ridden in a car for some 14 years, would be able, through observation, to accomplish the above intricate operation. It

is my opinion that that assumption is mere speculation —unreasonable and absurd. To go through the steps above outlined would have taken an experienced and expert driver. Had defendant, being without experience as a driver, driven the car, under gas, backward, it is reasonable to suppose that the car would have gone through the garage door, which was loose at the bottom, clear out into the street. The apartment house witnesses, who appeared to have seen a great deal but heard little that evening, would certainly have heard the noise made by the above assumed operation.

There is a significant failure of proof of defendant's finger prints in any respect whatsoever. The officers sought to obtain finger prints but none were available. Had defendant motivated the car, there certainly would have been finger prints either on the door handle, the steering wheel, the gear shift or the key.

The majority opinion ascribes defendant's actions to that of guilt. It is my opinion that every action of defendant noted was compatible with innocence. It is obvious from the record that the decedent was given to excessive drinking, and that he was drinking the evening of his death. Would it not be a normal action for his wife to bring him back from the street where he might make a spectacle of himself. The breaking of the furniture in the apartment could be reasonably laid to the actions of an inebriated man. The endeavors in the garage, as ascribed to defendant, to get her husband into the apartment house and wipe up blood could be reasonably imputed to that of a wifely act. The inconsistent statements of defendant might just as well be attributed to fright, forgetfulness, or even design in an effort to cover up a situation which im-

pliedly involved her. The fact that defendant did not answer the door buzzer when her daughter and son-in-law arrived means nothing since defendant did not know of their coming to the apartment from Eugene. It is reasonable to suppose that she did not want to admit a stranger to the apartment to find her husband in a drunken condition and the premises disordered.

I am unable to find a motive on the part of defendant to slay her husband. In the early part of the evening of the tragedy, defendant cut decedent's hair, and when the daughter and son-in-law arrived, the daughter and the defendant went out for a bit of food while the deceased and his son-in-law remained in the apartment. The two, after eating, returned to the apartment, and, after a visit, the daughter and her husband left the apartment to return home accompanied by decedent, who stated that he was going out to put his car in the garage. There is no evidence of threats against the deceased by the defendant, nor is there any evidence of serious trouble between them. No reasonable motive for the killing is advanced by the state. In any event, motive, like opportunity, unaccompanied by substantial evidence that defendant perpetrated the alleged deed, is insufficient to warrant a conviction.

The evidence shows that Dr. Richardson performed an autopsy, which included an examination of the lungs, on the body of deceased and found no carbon monoxide in his body. We quote:

"Q Did you test to see if there was any presence of carbon monoxide in the body?

"A Yes, I did.

"Q What did you discover?

"A Well, I went back and ran several chemical tests on it, and I could find no indication of carbon monoxide in the body."

Since it was the state's theory that decedent was killed by the movement of the automobile backward, and that his body was crushed between the rear bumper of the car and the closed door, it unquestionably was considered unreasonable and illogical, and, indeed, impossible, for the car to have been moved backward by gas propulsion without the presence of carbon monoxide in decedent's lungs. The state, therefore, arrived at what was thought to be the only reasonable theory under which defendant accomplished the homicide, and that is the reverse-gear-battery operation with the intention of defendant to asphyxiate her husband. As hereinbefore pointed out, the majority opinion rejects that theory. It adopts the theory, rejected by the state, which, as already stated, is unreasonable in fact and devoid of demonstration. It does not point out the *modus operandi* by which defendant propelled the car backward and again forward. Its conclusion is based on the proposition that it was not "impossible for the defendant to have performed the act which someone unquestionably performed and which the evidence tends so strongly to show must have taken place when she and her husband were alone in the garage." I have always understood that law suits are tried on probabilities rather than on possibilities because anything is possible under the sun.

Nor does the concurring opinion of Chief Justice Brand disclose how the movement of the car by defendant could have effectuated the death of the deceased. He relies on § 3 of Article VII of the constitution where it is stated that we are not permitted to re-examine the facts tried by a jury unless we can "affirmatively say there is no evidence to support the verdict. * * *" He concludes by saying that he is

unable to " 'affirmatively say there is no evidence to support the verdict.' " Construing the aforementioned constitutional provision, we have said that the verdict of a jury cannot be disturbed "if there is any competent evidence to support each material allegation contained in the indictment." *State v. Broom et al.,* 135 Or 641, 649, 297 P 340. Since the defendant challenged the sufficiency of the evidence by a motion for a directed verdict, the burden is upon the state to disclose such evidence, if any. The state having failed to so do, since its asphyxiation theory has been thrown into the ash can by the prevailing opinion, this court, through its opinion, has taken up the laboring oar, and, therefore, it devolves upon the author of such opinion, in my opinion, to point out affirmatively that evidence which would be deemed in law substantial and satisfactory evidence to warrant the submission of the case to the jury.

Moreover, what possible application can § 3 of Article VII of the constitution have to the present dispute? The court has already set aside the verdict; therefore, there is no verdict to be supported by evidence. The sole question is whether there is sufficient evidence to justify another trial. To send the case back for retrial upon the evidence in this record would be merely to pass the buck to a jury to speculate upon how the death might have occurred. The majority suggests no answer to that question.

Some suggestion has been made, although not by the state, that the jury would have been warranted in finding that defendant could have moved the car manually. The evidence shows that, at the behest of Dr. Richardson, the sheriff, "a big strong husky fellow", placed the gear shift in neutral, the brake being disengaged, and tried to shove the car backward out

of the garage. He was unable to do so. A movable jack was then procured, the car hoisted, and an attempt made to roll the car backward out into the street. This failed as the car slipped off the jack. If the sheriff· could not move the car backward manually, no human body intervening, and the garage door being open, it would be absurd to entertain the idea that defendant manually moved the car into the body of her husband against the garage door, exerting a pressure of from 500 to 600 pounds, and then manually moved the car forward to its original forward position.

I am not so sure that death occurred in the garage through the instrumentality of the automobile in question. Decedent, concededly drunk, could just as well have been struck on the outside of the garage, either by a car backing out of one of the adjoining garages or by a car traversing the thoroughfare. The deceased could then have been placed into the garage by the operator of the car involved. The blood spots on the bumper and on the garage door within the 13-inch space, and other evidences, could have been occasioned by the defendant's dragging the body through that opening.

A person's liberty, and perhaps life, should not hang on such flimsy circumstantial evidence. It has been well said that a chain is no stronger than its weakest link. Here the link is not only weak, but entirely missing.

Since the theory of motivation of the car by battery has been withdrawn by the majority opinion; since defendant could not have driven the car by gas propulsion because of her inability to so do, and because of the absence of carbon monoxide in decedent's body; and, since defendant could not manually move the car, where is there any evidence to connect defendant with

the alleged crime? I am firmly convinced that the jury had no substantial evidence to connect defendant with the alleged homicide.

Decedent's death is a mystery, but that is no reason to plant the stigma of guilt on the defendant in the absence of substantial evidence of her guilt. I would reverse with directions to dismiss.

Mr. Justice TOOZE authorizes me to say that he concurs in the foregoing opinion.